The **PEOPLE** of the State of Colorado, ex rel. Hal D. **SIMPSON**, State Engineer, and Steven J. Witte, Division Engineer for Water Division 2, Plaintiffs–Appellees,

v.

The **HIGHLAND IRRIGATION COMPANY**, a mutual ditch company, and The Nine Mile Canal Company, a mutual ditch company, Defendants–Appellants.

No. 94SA136.

Supreme Court of Colorado, En Banc.

April 10, 1995.

As Modified on Denial of Rehearing April 24, 1995.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timo-

thy M. Tymkovich, Sol. Gen., Patricia S. Bangert, Deputy Atty. Gen., Wendy C. Weiss, First Asst. Atty. Gen., Natural Resources Section, Denver, for plaintiffs-appellees.

Grimshaw & Harring, P.C., Wayne B. Schroeder, Denver, for defendants-appellants.

Fairfield and Woods, P.C., Howard Holme, Stephen H. Leonhardt, Denver, for amicus curiae Southeastern Colo. Water Conservancy Dist.

Justice VOLLACK delivered the Opinion of the Court.

Defendants–Appellants The Highland Irrigation Company and The Nine Mile Canal Company (the defendants) appeal a ruling by the District Court, Water Division 2 (the water court), which enjoined the defendants from diverting water in contradiction to the orders of the Division Engineer for Water Division 2 (the division engineer). The water court held that the defendants were without standing to assert, as an affirmative defense to the injunction action initiated by the People of the State of Colorado (the State), that the division engineer's curtailment orders were invalid.

We find that the water court erred in concluding that the defendants lacked standing to pursue their affirmative defense. We therefore reverse and remand the case for further proceedings.

## I.

This case involves a dispute over the administration of water rights on the Arkansas and Purgatoire Rivers in southeastern Colorado.[1] The defendants are two mutual ditch companies which divert water upstream from the John Martin Reservoir on the Purgatoire River. In order to focus the issue in this case, it is necessary to give some background in how these waters are managed.

The administration of water rights along both rivers is affected by an agreement between Kansas and Colorado called the Arkansas River Compact (the Compact). The Compact was intended to settle disputes between Kansas and Colorado over water in the Arkansas River, to allocate water between the two states, and to promote the efficient administration of the John Martin Reservoir for the benefit of both states. *See* Arkansas River Compact, ch. 155, art. I, 63 Stat. 145 (1949); § 37–69–101(art. I), 15 C.R.S. (1990).[2]

The Arkansas River Compact Administration (ARCA), an interstate agency created by the Compact, has authority to administer the provisions of the Compact. In particular, the ARCA has the power to adopt rules and regulations consistent with the Compact, to prescribe procedures for the administration of the Compact, and to perform all necessary and proper functions for its implementation. The ARCA is comprised of three representatives each from Colorado and Kansas, and every decision of the ARCA must be unanimous. § 37–69–101(art. VIII)(D), 15 C.R.S. (1990).

The Compact itself provides a fairly straight-forward method for administering water that enters John Martin Reservoir. For purposes of water storage and release, the calendar year is divided into two storage periods: a winter storage period and a summer storage period. Winter storage commences on the first of November of each year and continues through the last day of March. During the winter storage period, all of the water entering the John Martin Reservoir is stored.[3] § 37–69–101(art. V)(A), 15 C.R.S. (1990). The summer storage period commences on the first of April, and continues through the end of October. Generally speaking, water entering the reservoir

---

1. The Purgatoire River feeds into the Arkansas river just west of the John Martin Reservoir near Las Animas, Colorado.

2. The Compact was approved by Congress in 1949, as is required under article I, § 10(2), of the United States Constitution. Arkansas River Compact, ch. 155, 63 Stat. 145 (1949). The Compact is codified in Colorado at §§ 37–69–101

to –106, 15 C.R.S. (1990); hereafter, all citations to the Compact will be to the Colorado Revised Statutes.

3. Colorado may demand a release of water equivalent to the water flow, not to exceed 100 cubic feet per second. § 37–69–101(art. V)(A), 15 C.R.S. (1990).

during the summer storage period is also stored.

Under the terms of the Compact, both Colorado water users downstream from the John Martin Reservoir, and Kansas, can demand a release of stored water beginning April 1 of each year, the beginning of the summer storage period, in amounts not to exceed a specified rate. § 37–69–101(art. V)(C), 15 C.R.S. (1990). Neither Kansas nor Colorado is given a specific volume of water. Instead, the Compact employs a common pool concept, which means that the water can be released to Colorado and Kansas on demand, limited only by the Compact requirement that any release of water be applied "promptly to beneficial use." § 37–69–101(art. V)(E)(2), 15 C.R.S. (1990).

Water entering the John Martin Reservoir is stored in the reservoir's "conservation pool." The conservation pool is defined by the Compact as that portion of the total storage space in the reservoir which is not reserved for flood control purposes. § 37–69–101(art. III)(F), 15 C.R.S. (1990). The Compact contemplates that the conservation pool may be exhausted at some point during the year. In that event, the Compact provides for Colorado to administer the water rights of the ditches downstream from the John Martin Reservoir (Colorado water district 67 users)[4] under the priority system, until such time as water is available for release in the conservation pool. § 37–69–101(art. V)(F), 15 C.R.S. (1990). Accordingly, a water user in Colorado water district 67 who has priority can make a call for water against both Colorado water district 67 users, and against users upstream from the John

Martin Reservoir. The Compact also specifically provides that, "when there is water in the conservation pool[,] the water users upstream from John Martin [R]eservoir shall not be affected by the decrees to the ditches in Colorado water district 67." Id.[5]

In 1980, the ARCA adopted an Operating Plan for the John Martin Reservoir (the Operating Plan), which modifies the administration of the John Martin Reservoir under the Compact. As revised in 1984, the Operating Plan replaces the common pool concept included in the Compact with a system of water accounts. Under the Operating Plan, Colorado water district 67 users, and Kansas, are given the equivalent of savings accounts for water. Beginning the first of April, but no later than April 7 at 8:00 a.m., the stored water, or "conservation storage," is "released" into those accounts: forty percent for Kansas accounts, and sixty percent for Colorado water district 67 accounts. When water is "released" into the accounts pursuant to the Operating Plan, it is not physically released from the reservoir, but is rather transferred on paper for accounting purposes. Once all of the conservation storage has been transferred to accounts, the Operating Plan provides that, for the purposes of the Compact, "the conservation pool shall be *deemed exhausted.*" (Emphasis added.) Since the conservation pool is deemed empty, Colorado water district 67 users, when they have a priority water right, can make a call against a water user upstream from the John Martin Reservoir under the Operating Plan, even though the reservoir might still physically contain storage water.

**4.** The Compact specifically refers to the water rights of the users in Colorado water district 67. § 37–69–101(art. V)(F), 15 C.R.S. (1990). The "ditches of Colorado water district 67" are defined in the Compact as "those ditches and canals which divert water from the Arkansas river or its tributaries downstream from John Martin dam for irrigation use in Colorado." § 37–69–101(art. III)(G), 15 C.R.S. (1990).

In 1969, the Colorado legislature reorganized the system for water rights administration, creating seven water divisions within the state, and eliminating the previous water districts. Ch. 373, secs. 1 to 24, §§ 37–92–101 to –602, 1969 Colo.Sess.Laws 1200–1224. The downstream

users whose superior water rights were allegedly infringed are located in former water district 67. In this opinion, we refer to those users as Colorado water district 67 users.

**5.** *See also* § 37–69–101(art. V)(D), 15 C.R.S. (1990), which provides:

Releases authorized by paragraphs A, B, and C of this article, except when all Colorado water users are operating under decree priorities as provided in paragraphs F and G of this article, *shall not impose any call on Colorado water users that divert waters of the Arkansas river upstream from John Martin dam.* (Emphasis added.)

After the terms of the Operating Plan were initiated, some of the water users upstream from John Martin Reservoir apparently became concerned that they were subject to earlier calls under the Operating Plan than they had been before the Operating Plan. Those upstream ditches and the Colorado water district 67 users thereafter entered into an agreement which affected the administration of water under the Operating Plan with respect to when the downstream ditches could make a call through the reservoir to the upstream users (Agreement B).[6] Specifically, Agreement B provides that, as long as the downstream ditches have summer storage water in their accounts, the ditches cannot place a call upstream for water. Agreement B also provides that any water in a ditch's winter storage account which is not used by May 1 is automatically converted to summer storage water on that date.

## II.

The circumstances giving rise to this case occurred in 1993. Each defendant owns water rights which are junior in priority to ditches downstream from the reservoir in Colorado water district 67. On April 26, 1993, the division engineer, acting on a call for water by three senior downstream ditches, issued an order under section 37–92–502, 15 C.R.S. (1990),[7] for the defendants to curtail their water diversions under their junior priorities. The defendants did not comply with the orders, and instead continued to divert water.

On May 13, 1993, the State filed complaints in the water court pursuant to section 37–92–503, 15 C.R.S. (1990), asking for preliminary and permanent injunctive relief against the defendants. The State alleged that the out-of-priority diversions by the defendants had caused material injury to downstream users with senior water rights.

In response, the defendants asserted an affirmative defense, arguing that the Operating Plan was not a lawful basis for the State's curtailment orders because the Operating Plan was in direct violation of the terms of the Compact.[8] Therefore, the defendants argued, the division engineer's orders, which were made pursuant to the Operating Plan, were unenforceable. The defendants also filed a notice of removal in the United States District Court for the District of Colorado (the federal district court) pursuant to 28 U.S.C. § 1441(b) (1988). They maintained that the State's complaint could properly be removed to the federal district court since the lawfulness of the orders under the Compact was a question of federal law.[9]

The State objected to the removal and filed a motion with the federal district court requesting a remand of the case to the water court under 28 U.S.C. § 1447(c) (1988). The State's position was that there was no basis for federal jurisdiction over the case. The federal district court agreed, and on August 12, 1993, remanded the case to the water court, finding that the validity of the curtailment orders under the Compact, although it was a defense based on federal law, was not

---

6. The defendants were not signatories to the agreement.

7. Section 37–92–501(1), 15 C.R.S. (1990), gives authority to the state engineer and the division engineers to "administer, distribute, and regulate the waters of the state" in accordance with state law. In order to implement the provisions of § 37–92–501(1), the state engineer and the division engineers may issue orders preventing a water user from making diversions of water out of priority. § 37–92–502, 15 C.R.S. (1990). In the event that a water user does not comply with an order made by the state engineer or a division engineer under § 37–92–502, the State, on behalf of the engineers, may seek an injunction, preventing the water user from further violations of the order. § 37–92–503, 15 C.R.S. (1990).

8. The defendants' other affirmative defenses are not at issue in this case.

9. The defendants made a previous attempt to challenge the validity of the Operating Plan in federal district court. On June 8, 1992, the defendants filed a complaint in the federal district court, seeking a declaratory judgment that the Operating Plan was *ultra vires* and unenforceable under the terms of the Compact. The federal district court stayed proceedings in that case pending the outcome of *Kansas v. Colorado,* No. 105, Original (U.S.1985 Term). *Highland Irrigation Co., et al. v. The Arkansas River Compact Admin.,* No. 92–C–1151 (D.Colo. Aug. 20, 1992). Although *Kansas v. Colorado* was recently argued in the United States Supreme Court, the *Highland Irrigation* case in federal district court has apparently been closed.

an essential element of the State's case. *People ex rel. Simpson v. Nine Mile Canal Co.,* 828 F.Supp. 823 (D.Colo.1993).

Shortly thereafter the parties filed cross-motions for summary judgment in the water court. The defendants argued that the curtailment orders were invalid as a matter of law because they were contrary to the terms of the Compact. The State, in contrast, argued that the defendants did not have standing to challenge the validity of the Operating Plan because the defendants could not establish a causal connection between their injury and the Operating Plan and because they failed to show that any injury would be redressed by invalidating the Operating Plan. In the alternative, the State argued that the Operating Plan was a valid exercise of the ARCA's authority under the Compact.

On November 2, 1993, the water court denied the parties' motions for summary judgment. In its order, the water court also held that the defendants would have to prove at trial that they had standing to assert their affirmative defense, including actual injury, causation, and redressability, under federal standing principles.

Before trial, the defendants filed a second motion for summary judgment. The defendants argued that the Operating Plan and the curtailment orders issued thereunder were invalid as a matter of law because the Army Corps of Engineers had not approved of the changes encompassed in the Operating Plan, as was required under the Compact. The water court denied the motion and the case proceeded to trial.

At the trial, the State called several witnesses who explained the process of water rights administration under the Compact, the Operating Plan, and Agreement B. The State introduced evidence to establish that the defendants' out-of-priority diversion of water caused material injury to the downstream ditches with senior water rights. The State also introduced evidence to show that the defendants were not injured by the Operating Plan because they were not subjected to more frequent calls for water than they had been before the Operating Plan.

Through cross-examination of the State's witnesses, the defendants elicited testimony to establish that the downstream ditches' call for water against the defendants would have been delayed for a couple of weeks to a month if the downstream ditches had used the water actually stored in the John Martin Reservoir in April 1993. Additionally, a shareholder of one of the defendants testified that, as early as 1984, he was advised by an ARCA member that the Operating Plan was "probably contrary to law," that the defendants' water rights could possibly be damaged by the Operating Plan, and that one way for the defendants to challenge the Operating Plan would be to refuse to obey curtailment orders under the Operating Plan.

On March 8, 1994, the water court issued its decision, ruling that the defendants did not have standing to assert the invalidity of the Operating Plan as an affirmative defense at trial. The water court found that the defendants failed to prove that throughout the irrigation season they were curtailed more frequently than if the Operating Plan was not in place. The water court therefore concluded that the defendants failed to show redressability. In reaching this conclusion, the water court noted that deposition testimony indicated that, but for the Operating Plan and Agreement B, the John Martin Reservoir would typically be completely empty during the first part of April of each year, initiating an earlier call on the defendants than under the Operating Plan and Agreement B. Because of its ruling on lack of standing to assert the affirmative defense, the water court did not reach the issue of the validity of the Operating Plan. The water court upheld the orders of the division engineer and enjoined the defendants from violating the orders in the future. The court also awarded to the State attorney fees, expert fees, and costs in the amount of $42,-638.20.

### III.

The sole issue on appeal is whether the water court erred in finding that the defendants did not have standing to litigate their affirmative defense that the curtailment orders issued by the division engineer pursuant

to the Operating Plan and Agreement B were invalid because they were in violation of the terms of the Compact. The water court found that the defendants lacked standing because they were not harmed, but rather were benefited by the Operating Plan and Agreement B. We disagree with the water court and conclude that the defendants have standing to assert the invalidity of the curtailment orders as a basis for their defense to the State's suit for injunction.

The water court's and the parties' emphasis on standing in this case is extremely unusual, because the issue of standing normally arises in the context of the *plaintiff's* standing to sue, and not the defendant's standing to defend against suit. *See* 13 Charles Alan Wright, Arthur R. Miller & Edward Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 3531, at 339–40 (1984) (noting that the party focused upon, for the standing question, is almost invariably the plaintiff). The majority of cases relied upon by the water court and the parties for determining whether the defendants established standing in this case are cases in which the plaintiff's standing to sue was challenged, not the defendant's standing to assert an affirmative defense. The difficulty with extending the traditional notion of plaintiff standing to defendants is that defendants ordinarily are simply attempting to defend against suit, as here, and are not seeking independent affirmative relief. In other words, the defendants are only in court because the State, as plaintiff, put them there.

■■■ In the context of plaintiff's standing, we have repeatedly held that the plaintiff has standing *to sue* if there is injury in fact, *Board of County Comm'rs v. Bowen/Edwards Assocs.*, 830 P.2d 1045, 1052 (Colo. 1992), and if the injury is to a legally protected right or interest. *Id.* at 1052. This requirement limits plaintiffs from asserting claims in which they have no stake, and ensures that the jurisdiction of the courts is exercised only when an actual case or controversy exists. *Colorado Gen. Assembly v. Lamm*, 700 P.2d 508, 515–16 (Colo.1985). Those same concerns are not implicated with respect to the defendants, because once the plaintiff has established standing and the

defendants have been haled into court by the plaintiff, the only role for the defendants is to defend against the suit. The defendants' affirmative defense does not constitute an independent cause of action, but is a defensive claim only. Therefore, the rules for determining whether a plaintiff has standing are simply inapplicable to the defendants in this case.

■■■ It is clear to us that the defendants have standing as a matter of course to defend against the State's injunction action and that the water court's standing analysis with respect to the defendants was misplaced. The defendants are merely attempting to avoid the injunction stemming from the curtailment orders. As such, they are seeking only to have the action for an injunction dismissed because, they argue, the curtailment orders of the division engineer, made pursuant to the Operating Plan and Agreement B, violate the terms of the Compact. In essence, the defendants are arguing that the division engineer's orders are void and that the orders therefore cannot serve as the basis for the State's injunction action.

We acknowledge that, in certain circumstances, a defendant who challenges an enforcement action may lack standing to assert an affirmative defense to governmental action. However, those cases in which a defendant was found to lack standing usually involve a *criminal* defendant's attempt to challenge the statute or ordinance on the ground that the provision is unconstitutionally overbroad. *See, e.g., People v. Heitzman*, 852 P.2d 443, 447 (Colo.1993) (holding that the defendant did not have standing to challenge the constitutionality of a statutory provision limiting the right of criminal defendants to attack their convictions after losing on appeal, because the defendant never appealed his conviction); *People v. Fuller*, 791 P.2d 702, 709 (Colo.1990) (finding that the defendant did not have standing to challenge the constitutionality of the statute providing for a defense of impaired mental condition, because he did not raise the defense); *see also People v. Rankin*, 724 P.2d 1354, 1356 (Colo. 1986).

■ The criminal defendants lacked standing in those cases because they did not allege that their own constitutional rights were violated, in which case they would clearly have standing, but instead asserted the interests of third parties who were not before the court. *See Heitzman,* 852 P.2d at 447 (quoting *People v. Stage,* 195 Colo. 110, 112, 575 P.2d 423, 424 (1978)) (" '[A] person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the court.' ").[10]

Those cases are thus wholly inapplicable to the situation here, in which the defendants are asserting their own interests in the administration of their water rights in accord with the terms of the Compact. The defendants clearly have some interest in the administration of their water rights under the Compact since the State's enforcement proceeding is entirely predicated on the assertion that the Compact gives the ARCA authority to enter into the Operating Plan, which in turn purportedly gives the division engineer authority to curtail the defendants' diversions. Since the defendants asserted an appropriate basis for their affirmative defense, it was not necessary for the water court to get embroiled in the issue of whether the Operating Plan and Agreement B function to the ultimate benefit or detriment of the defendants. That issue need not even be decided on the merits of the defendants' affirmative defense.

## IV.

We conclude that the defendants have standing to assert their affirmative defense. Accordingly, we reverse the judgment of the water court and remand for further proceedings.

---

The prohibition against third-party standing will generally prevent a party from making the claims of third parties who are not involved in the lawsuit. However, we have allowed third-party standing in the context of overbreadth challenges to statutes which threaten fundamental constitutional rights, i.e., First Amendment rights. *See, e.g., Ferguson v. People,* 824 P.2d 803, 807–08 (Colo.1992); *People in the Interest of J.M.,* 768 P.2d 219, 224 (Colo.1989).