The PEOPLE of the State of Colorado, ex rel. Hal D. SIMPSON, State Engineer; and Steven J. Witte, Division Engineer for Water Division 2, Plaintiffs–Appellees,

v.

The HIGHLAND IRRIGATION COMPANY, a mutual ditch company; and The Nine Mile Canal Company, a mutual ditch company, Defendants–Appellants.

No. 95SA245.

Supreme Court of Colorado,
En Banc.

June 3, 1996.

As Modified on Denial of Rehearing
June 17, 1996.

Gale A. Norton, Attorney General, Stephen E. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Wendy C. Weiss, First Assistant Attorney General, Natural Resources Section, Denver, for Plaintiffs–Appellees.

Grimshaw & Harring, P.C., Wayne B. Schroeder, Denver, for Defendants–Appellants.

David L. Harrison, Amelia S. Whiting, Boulder, for Amicus Curiae Lower Arkansas Water Management Association.

Holland & Hart, Anne J. Castle, Denver, for Amicus Curiae Continental Grain Company d/b/a Colorado Beef.

Shinn Lawyers, Carl M. Shinn, Donald L. Steerman, Lamar, for Amicus Curiae District 67 Irrigating Canals Association.

Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Jennifer L. Gimbel, Deputy Attorney General, Natural Resources Section, Denver, for Amicus Curiae Colorado Water Conservation Board.

Fairfield and Woods, P.C., Howard Holme, Stephen L. Leonhardt, Denver, for Amicus Curiae Southeastern Colorado Water Conservancy District.

Lefferdink & Bullock, John S. Lefferdink, Lamar, for Amicus Curiae Fort Lyon Canal Company.

Michael T. Mitchell, Parker, for Amicus Curiae Arkansas Valley Ditch Association.

Justice HOBBS delivered the Opinion of the Court.

This appeal is from a judgment of the District Court for Water Division 2 enjoining appellants, two upstream mutual ditch companies holding junior priorities, The Highland Irrigation Company (Highland) and The Nine Mile Canal Company (Nine Mile), from any continued violation of diversion curtailment orders issued by the Division Engineer (Engineer). The curtailment orders were issued under section 37–92–502, 15 C.R.S. (1990), to enforce a call by owners of senior priorities downstream of John Martin Reservoir on the Arkansas River. In our previous decision, *Colorado ex rel. Simpson v. Highland Irrigation Co.*, 893 P.2d 122 (Colo.1995), we reversed the water court's determination that Highland and Nine Mile lacked standing to pursue an affirmative defense to the Engineer's enforcement orders posited on the Arkansas River Compact, chapter 155, 63 Stat. 145 (1949), section 37–69–101, 15 C.R.S. (1990), (the Compact). On remand, that defense was examined and rejected by the water court. The court ruled in favor of the state appellees, the Division and State Engineers. Pursuant to section 37–92–503, 15 C.R.S. (1990), the water court entered a judgment which included an injunction against further violation of the Engineer's orders and an award of costs and reasonable attorneys fees against Highland and Nine Mile. We affirm the judgment.

I.

Pertinent facts of this case are set forth in our prior opinion, *Colorado ex rel. Simpson v. Highland Irrigation Co.*, 893 P.2d 122 (Colo.1995), which we now summarize and supplement from the record before us. Under the Compact, John Martin Reservoir is operated by the Corps of Engineers, with the Arkansas River Compact Administration (ARCA) playing the key role in prescribing procedures for Compact administration and the management of John Martin Reservoir for the benefit of Colorado, Kansas and, through them, water users of both states. ARCA is composed of three members from each state. As to all decisions and matters of administration, each state has one vote and both states must agree. With regard to the Colorado ARCA members, Article VIII C provides that one member shall be a resident and water right owner in water districts 14 or 17 (upstream from the reservoir), one member shall be a resident and water right owner in water district 67 (downstream), and

the third Colorado member shall be the director of the Colorado Water Conservation Board.

Under Article VIII G(1) of the Compact, ARCA is directed to

co-operate with the chief official of each state charged with the administration of water rights and with federal agencies in the systematic determination and correlation of the facts as to the flow and diversion of the waters of the Arkansas river and as to the operation and siltation of John Martin Reservoir and other related structures.

Article VIII H additionally provides that enforcement of the Compact will be accomplished primarily through the state agencies and officials charged with the administration of water rights within each state.

In 1980, ARCA adopted an Operating Plan, revised in 1984, designed to provide greater reliability in the use of John Martin Reservoir waters for the benefit of Colorado and Kansas water users. Under the Operating Plan, waters accruing to the reservoir's conservation pool during the "period of winter storage" between November 1 and March 31 of each year are re-allocated commencing the first week of April [1] to individual storage accounts in the reservoir, forty percent to Kansas, sixty percent to Colorado.

Colorado's sixty percent portion of the accrued conservation water is transferred into nine accounts, in percentages proportionately allotted to each of the nine downstream ditch companies, *Kansas v. Colorado,* — U.S. —, —, 115 S.Ct. 1733, 1744, 131 L.Ed.2d 759 (1995), for retention in the reservoir and use on demand of the Colorado water users downstream of the reservoir in water district 67. Under the Operating Plan, this transfer parallels in amount and duration those releases from the reservoir contemplated by the Compact. During the period of transfer into the accounts, the Colorado priority system is suspended in favor of water users upstream of the reservoir, with regard to water users below the reservoir. The Compact contains a no-call provision in favor of priorities upstream of John Martin Reservoir until ARCA determines that the conservation pool water will be exhausted within two weeks. Notice must be given within the two-week period of a day certain when priority administration of Colorado water rights will resume.

Prior to adoption of the Operating Plan, exhaustion of the conservation pool through physical releases from storage had occurred during April. Under the Operating Plan, when the water of the conservation pool is fully placed into the individual accounts at the beginning of the irrigation season, the conservation pool is deemed to have been exhausted, whether or not actual releases have been made from the reservoir, and the no-call provision abates in favor of priority administration within Colorado by the Engineer. The primary effects of the Operating Plan are to provide Colorado and Kansas each with a secure percentage of the conservation pool water and to alleviate pre-existing conditions which encouraged a race to empty the conservation pool by the water users of both states. ARCA determined that John Martin Reservoir water is more efficiently managed for ultimate beneficial use through this procedure.

Under the circumstances of this case, transfer of conservation water into the accounts had begun on April 1 of 1993 and was completed on April 25. On April 26, 1993, three downstream ditch companies with senior rights were calling for irrigation water. In order to enforce the call, oral and written curtailment orders were issued to Highland and Nine Mile on April 26–27, 1993, but were ignored by Highland and, four days later, by Nine Mile. The Lamar, Keesee, and Amity companies properly placed the call under Colorado priority administration, since they held water rights senior to Highland's 1909 right and Nine Mile's 1887 and 1930 rights.

---

1. Under the Operating Plan, Section II.A., "[c]onservation storage shall be released into the accounts ... beginning at the first request for release after March 31 of account water by a Colorado Water District 67 ditch or by Kansas or beginning at 8:00 a.m. on April 7, whichever occurs first." Section I.B provides that "summer storage season" shall commence "at the first exhaustion of conservation storage and continuing to and including the next succeeding October 31."

Highland had two senior water rights totaling 24 cubic feet per second, as to which the curtailment orders were not applied.

Highland and Nine Mile continued thereafter during the 1993 irrigation season to divert from the Purgatoire River, tributary to the Arkansas River upstream of John Martin Reservoir, in violation of the Engineer's orders.

The Division and State Engineers brought an action under section 37-92-503, 15 C.R.S. (1990), in the water court to enforce the curtailment orders. The water court determined that Highland and Nine Mile failed to prove that "throughout the irrigation season they are curtailed more frequently under the Operating Plan than they would be without it and that they are likely to be curtailed less frequently in the future if the Operating Plan is declared invalid."

Implementation of the Operating Plan has not been to the detriment of Highland and Nine Mile. Duane Helton, expert for the state, testified that the diversions of Highland and Nine Mile had materially increased after implementation of the Operating Plan: during the pre-Operating Plan period, Highland's average yearly summer storage period diversions were 6,059 acre-feet; during the post-Operating Plan period, Highland's diversions averaged 8,944 acre-feet. Nine Mile's average yearly summer storage period diversions were 3,884 acre-feet during the pre-Operating Plan period, but during the post-Operating Plan period, Nine Mile averaged 5,533 acre-feet.[2]

Highland and Nine Mile request that we strike down the Operating Plan or, alternatively, effectuate a revision of its terms to incorporate their view of the Compact's no-call provision. They assert that the Compact supersedes the operation of Colorado's priority system as to the holders of priorities downstream of John Martin Reservoir while any unreleased transferred water remains in the individual accounts.

The State of Colorado and the amicus curiae Colorado Water Conservation Board and the mutual ditch companies downstream of John Martin Reservoir contend that the orders of the Engineer were lawful and must be enforced. They defend the Operating Plan as having been properly adopted by ARCA under its Compact powers, and they ask that the judgment of the water court be upheld. We agree.

## II.

The states of Colorado and Kansas share a vital interest in the waters of the Arkansas River. As this river has nurtured the economy of both, *Kansas v. Colorado*, 206 U.S. 46, 108–13, 27 S.Ct. 655, 671–74, 51 L.Ed. 956 (1907), conflict over what share shall be enjoyed by the water users of each state has forged the federal law of equitable apportionment and of interstate water compact enforcement. The case before us again demonstrates that the river's reach continues to be matched by the vigilance of those who depend upon its strength.

### A.

Early in the Twentieth Century, Kansas sought to establish that its territorial stretch to the heart of the Continental Divide dating from 1854, despite its later boundary attenuation by the establishment of the Colorado Territory and Kansas statehood in 1861,[3] had resulted in Kansas citizens having the "right to the uninterrupted and unimpeded flow of all the waters of the river into and across the State of Kansas." *Kansas v. Colorado*, 185 U.S. 125, 135, 22 S.Ct. 552, 555, 46 L.Ed. 838 (1902). Seeking dismissal of this Kansas complaint sounding in common law riparianism, Colorado asserted "rights of sovereignty," *id.* at 143, 22 S.Ct. at 558, to consume all

---

2. Helton additionally testified that: "If you compare the amount of water that was available at [Nine Mile] gaging station versus what was diverted during the 1950 through '78 period, the Highland and Nine Mile diverted 19.9 percent of the water at the Nine Mile gaging station. During the 1979 through '92 period, the Highland and Nine Mile diverted over 32 percent of the water available at the Nine Mile gaging station

... [E]ven though there was a substantial reduction in flow ... the diversions into the two ditches increased ... over 12 percent on an average annual basis."

3. Carl Ubbelohde et al., *A Colorado History* 100 (rev. centennial ed.1976).

waters within its boundaries for beneficial purposes, arguing that its constitutional prior appropriation doctrine, upon statehood in 1876, had been "enacted pursuant to national authority, and ratified thereby at the time of admission of the State into the Union." *Id.* at 139, 22 S.Ct. at 557.

Following the 1902 decision refusing to dismiss the Kansas complaint, the Court in its 1907 equitable apportionment decision held that, by reason of statehood, each state has full jurisdiction over "the beds of streams and other waters" within its boundaries. *Kansas v. Colorado,* 206 U.S. 46, 93, 27 S.Ct. 655, 665, 51 L.Ed. 956 (1907). Each state can choose its own water law, whether riparian or prior appropriation, but neither state may impose its choice of law on the other. *Id.* at 94, 27 S.Ct. at 666. The national government's interest in reclamation of arid lands could not supplant the water law selection of either state. *Id.* at 92, 27 S.Ct. at 665. And an equitable apportionment of the interstate water body can be ordered by the Court, subject to revision from time to time, in the exercise of the Court's original jurisdiction. *Id.* at 117, 27 S.Ct. at 675.

The Court found that Colorado's development of Arkansas River waters had produced great benefit within Colorado with relatively lesser detriment to Kansas, *id.* at 113–14, 27 S.Ct. at 674, and therefore refused to prevent the "present withdrawal of water in Colorado for purposes of irrigation." *Id.* at 114, 27 S.Ct. at 674. The Supreme Court invited Kansas to return for relief, *id.* at 117, 27 S.Ct. at 675, if a material increase in depletion by Colorado resulted in "destroying the equitable apportionment of benefits between the two states resulting from the flow of the river." *Id.* at 118, 27 S.Ct. at 676.

### B.

In the early 1940s, Colorado not Kansas commanded the return engagement. Colo-

rado sought in the United States Supreme Court to enjoin Kansas water users from suing in state and lower federal courts to curtail Colorado diversions. In response, Kansas alleged that Colorado had materially increased its river withdrawals and asked that its rights be quieted. The Court's Master recommended a definitive solution in the form of a volumetric apportionment between the states. But each objected to the proposed decree. Citing the existence of "complicated and delicate questions" and the possibility of "change of conditions" in the future, the Court declined judicial "imposition of a hard and fast rule," stressing instead the necessity of "expert administration." *Colorado v. Kansas,* 320 U.S. 383, 392, 64 S.Ct. 176, 180, 88 L.Ed. 116 (1943).

Having placed the disputing neighbors squarely on notice of the transitory nature of case-by-case adjudication, the Supreme Court pointedly suggested that Colorado and Kansas invoke the compact clause, U.S. Const. art. I, § 10, cl. 2, "to achieve mutual accommodation and agreement." *Colorado v. Kansas,* 320 U.S. at 392, 64 S.Ct. at 180.

### C.

By this time, Colorado, mother of many rivers, had mined the compact wellspring, equitable apportionment having failed from its standpoint in *Wyoming v. Colorado,* 259 U.S. 419, 42 S.Ct. 552, 66 L.Ed. 999 (1922). In staggering succession, Colorado took the lead, largely through the prolonged and devoted work of Delph Carpenter,[4] but assisted by many others, in executing the Colorado River Compact, the La Plata River Compact, the South Platte River Compact, the Rio Grande River Compact, and the Republican River Compact.[5]

In pre-World War II litigation involving the La Plata River Compact, Colorado had

---

4. *See* Address of Honorable Ralph L. Carr, Former Governor of Colorado, to the Seventeen States of the National Reclamation Association (October 29, 1943), *in Delph Carpenter Father of Colorado River Treaties* 1–8 (Colorado Water Resources Research Institute, Colorado State University, 1991). *See also* Peter A. Fahmy, *Delphus A. Carpenter, in Six of the Greatest: A Tribute to Outstanding Lawyers in Colorado History,* 23 Colo. Law. 1479, 1479–82 (1994).

5. Compacts are cited in order of their execution by the signatory states: Colorado River Compact, § 37–61–101, 15 C.R.S. (1990), ch. 72, 42 Stat. 171 (1921) (congressional consent to enter into the compact), 43 U.S.C. § 617*l* (1994) (the Boulder Canyon Project Act implemented and ratified the seven-state Colorado River Compact), La Plata River Compact, § 37–63–101, 15 C.R.S. (1990), ch. 110, 43 Stat. 796 (1925), South Platte River Compact, § 37–65–101, 15 C.R.S. (1990),

discovered that compacts have teeth. Overruling an opinion of this court, *Hinderlider v. La Plata River & Cherry Creek Ditch Co.,* 101 Colo. 73, 70 P.2d 849 (1937), the United States Supreme Court held that a state may create and protect vested water rights to water use only as to the state's apportioned share of the interstate stream. Individual water users of the signatory states were bound by the compact even where their state had recognized their water rights prior to execution of the compact. *Hinderlider v. La Plata River & Cherry Creek Ditch Co.,* 304 U.S. 92, 106, 58 S.Ct. 803, 809, 82 L.Ed. 1202 (1938).

■ Thereby, was it manifested that the Engineer can and should enforce compact delivery requirements with regard to Colorado water rights, adhering to the terms of the Compact and consistent, insofar as possible, with Colorado constitutional and statutory provisions for priority administration. *See Alamosa–La Jara Water Users Protection Ass'n v. Gould,* 674 P.2d 914, 923 (Colo.1983). In this manner, citizens of Colorado can partake reliably of the state's compact apportionment through property rights perfected for beneficial use within the state. *See Weibert v. Rothe Bros.,* 200 Colo. 310, 317, 618 P.2d 1367, 1371–72 (1980).

### III.

Colorado, by negotiation and settlement with Kansas, and with the ultimate approval of Congress, produced the Arkansas River Compact, section 37–69–101, 15 C.R.S. (1990), chapter 155, 63 Stat. 145 (1949) having achieved execution and ratification, in the same time period, of the Upper Colorado River Compact, section 37–62–101, 15 C.R.S. (1990), chapter 38, 63 Stat. 31 (1949).[6] Kansas has required effective enforcement of the Compact. The United States Supreme Court has ruled that post-compact well pumping by Coloradans did cause material depletion of usable stateline flows in violation of Kansas rights under the Compact. *Kansas v. Colorado,* —— U.S. ——, ——, 115 S.Ct. 1733, 1745, 131 L.Ed.2d 759 (1995).

John Martin Reservoir is a key feature to interstate cooperation between Colorado and Kansas. In matters of Compact administration, we understand the high importance which both states and all the litigants before us place on the operation of this reservoir. Existing carefully-positioned water works are indispensable to efficient water management, particularly in water-short stream systems with great interstate reliance placed on them.[7] Although water available for use in Colorado's Arkansas Valley has been materially increased by the transmountain Frying Pan–Arkansas Project, Pub.L. No. 87–590, 76 Stat. 389 (1962) (previously codified, 43 U.S.C. § 616 (1994)), we have recognized that the use in this state of Arkansas River water is constrained by shortage of available usable

ch. 46, 44 Stat. 195 (1926), Rio Grande River Compact, § 37–66–101, 15 C.R.S. (1990), ch. 155, 53 Stat. 785 (1939), Republican River Compact, § 37–67–101, 15 C.R.S. (1990), Pub.L. 60, 57 Stat. 86 (1943).

6. Of Colorado's nine water compacts, the other two compacts not previously mentioned in this opinion are the Amended Costilla Creek Compact, Pub.L. 88–198, 77 Stat. 350 (1963), § 37–68–101, 15 C.R.S. (1990), and the Animas–La Plata Project Compact, Pub.L. 90–537, 82 Stat. 898 (1968), § 37–64–101, 15 C.R.S. (1990). Two equitable apportionment cases not previously mentioned in which Colorado has an interest are *Nebraska v. Wyoming,* 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945) and *Wyoming v. Colorado,* 353 U.S. 953, 77 S.Ct. 865, 1 L.Ed.2d 906 (1957).

7. Progressive Conservationists of the late Nineteenth and early Twentieth Centuries viewed reservoirs as an essential means of conservation. *See* Samuel P. Hays, *Conservation and the Gospel of Efficiency: The Progressive Conservation Movement 1890–1920,* at 5 (1959). As of 1990, Colorado reservoirs numbered more than 1,900 statewide, with the capability of storing 8.85 million acre-feet of water. Colorado Water Resources Research Institute, Colorado State University, *Colorado's Water: Climate, Supply and Drought* 6 (1990). The state's instream flow program, as of 1990, included Colorado water conservation flow appropriations on 7,002.8 miles of state streams. Dan Merriman, The Colorado Water Conservation Board Program 4 (April 21, 1990)(unpublished paper distributed by Boulder County Bar Association and Natural Resources Law Center, University of Colorado at Boulder, for program on "Water for Instream Needs: Is Colorado Law Adequate?"). *See Board of County Comm'rs v. United States,* 891 P.2d 952, 972 (Colo.1995).

supply. *See Southeastern Colo. Water Conservancy Dist. v. City of Florence,* 688 P.2d 715, 716 (Colo.1984). Efficient water management is central to the Arkansas River Compact, the actions of ARCA in administering that Compact, the interests of Colorado and Kansas, and resolution of the case before us.

### A.

The Compact was executed between the states and approved by Congress to ensure Colorado and Kansas a secure and lasting apportionment of the waters of the Arkansas River. A water compact is both state and federal law. *Frontier Ditch Co. v. Southeastern Colo. Water Conservancy Dist.,* 761 P.2d 1117, 1123 (Colo.1988). In a prior appropriation state like Colorado, the essential function of a compact is to legally protect stream depletions for beneficial use under water rights within the state while making the required interstate deliveries.[8]

In reviewing matters decided upon between states in the course of mutual compact administration, we must not usurp the mechanisms for operation and dispute resolution that are included in the compact. Here, Article VIII of the Arkansas River Compact created ARCA with the power and responsibility for Compact administration and prescription of management procedures, including those applying to John Martin Reservoir. *Kansas v. Colorado,* —— U.S. at ——, 115 S.Ct. at 1738. Those provisions of the Compact include the following:

> A. To administer the provisions of this compact there is hereby created an interstate agency to be known as the Arkansas river compact administration herein designated as "the administration."
>
> B. The administration shall have power to:
>
> (1) Adopt, amend and revoke by-laws, rules and regulations consistent with the provisions of the compact;

> (2) Prescribe procedures for the administration of this compact: Provided, that where such procedures involve the operation of John Martin reservoir project they shall be subject to approval of the district engineer in charge of the said project;
>
> (3) Perform all functions required to implement this compact and to do all things necessary, proper or convenient in the performance of its duties.

In light of this authority, the need to respect resolution of interstate differences, and recognizing that ARCA actions require the consent of both states, we are called upon to uphold those actions of ARCA which forward the purposes of the Compact, do not conflict with its material terms, and accord deference to management decisions that benefit both states and, through them, their water users.

The Compact did not presume that water management through existing and new works would cease upon its execution. To the contrary, the United States Supreme Court has emphasized that Article IV D of the Arkansas River Compact permits:

> future beneficial development of the Arkansas River basin ... which may involve construction of dams, reservoir and other works for the purposes of water utilization and control, *as well as the improved or prolonged functioning of existing works:* Provided, that the waters of the Arkansas River ... shall not be depleted in usable quantity or availability....

*Kansas v. Colorado,* —— U.S. at ——, 115 S.Ct. at 1743–44.

Pursuant to powers vested in it by the Compact, including the Article IV D provision for the "improved or prolonged functioning of existing works," ARCA adopted the 1980 Operating Plan, revised in 1984, by which John Martin Reservoir conservation storage water is volumetrically allocated to individual Kansas and Colorado user ac-

---

**8.** The congressional approval feature of a compact is particularly important, in that Congress can assent to state laws which might otherwise be invalid as an unreasonable burden on inter-state commerce. *See generally,* William Cohen, *Congressional Power to Validate Unconstitutional State Laws: A Forgotten Solution to an Old Enigma,* 35 Stan. L.Rev. 387 (1983).

counts. Although the Operating Plan may be discontinued by either Colorado or Kansas in any year, both states have continued its existence during the past decade of intense conflict between the two throughout the recent *Kansas v. Colorado* compact litigation.

The reason for this notable accord amidst discord is disclosed by the record before us. In the absence of the Operating Plan, no certain portion of waters accruing to reservoir conservation storage could be relied upon by the users of either state. Fearing what others might demand and obtain, users of both states historically scrambled to empty John Martin Reservoir's conservation pool, according to the testimony of former State Engineer Jeris Danielson [9] and the water court's finding.

ARCA determined that the Operating Plan promotes the secure and efficient beneficial use of John Martin water. The trial court found that there was water in the reservoir at the time of the Division Engineer's orders in this case only because the Operating Plan and a related agreement, "Agreement B," [10] were in effect.

### B.

Highland and Nine Mile claim that the Compact requires imposition of the no-call provision so long as any water they consider to be conservation pool water remains in the reservoir. They ask us to invalidate curtailment orders of the Division Engineer and allow them to make what would otherwise be unaugmented out-of-priority diversions.

Highland and Nine Mile argue that two provisions of the Compact should be strictly interpreted to support their affirmative defense against enforcement of the Division Engineer's curtailment orders.

First, Article V F states, in part:

*except as controlled by the operation of the preceding provisions of this paragraph and other applicable provisions of this compact,* when there is water in the conservation pool the water users upstream from John Martin reservoir shall not be affected by the decrees to the ditches in Colorado water district 67.

(Emphasis added.) Second, Article V E(2) states: "Water released upon concurrent or separate demands shall be applied promptly to beneficial use unless storage thereof downstream is authorized by the administration."

Although Highland and Nine Mile argue for strict construction of the Compact, endorsing their interpretation would not give proper regard to the language we have underscored above or other language of the Compact. These other provisions, including Article VIII, incorporated by reference into Article V, provide sufficient basis for adoption and implementation of the Operating Plan. Moreover, Article V F anticipates enforcement of priorities within Colorado in providing that ARCA shall notify the Colorado State Engineer, fourteen days in advance, that the "conservation pool will be or is liable to be exhausted," whereupon:

Colorado shall administer the decreed rights of water users in Colorado water district 67 as against each other and as

---

9. In his deposition admitted at trial, Jeris Danielson testified: "[I]n the '70s, the states got into a horse race ... with each other as to who was going to run the most water and run it the fastest. I don't believe that was the intent of the Compact.... [T]he state not demanding its share could be shorted, which tended to result in running water from the vessel at ... large rates.... The conservation pool would be empty."

10. Under a 1984 agreement titled "Agreement B," (referred to as "Amendment B" in the trial court's March 8, 1994 order) an entity having

any summer stored water in its account cannot place a call above John Martin against the upstream ditches. "Agreement B," negotiated by the Colorado ARCA representatives of the upstream and downstream ditches, has the effect of substantially delaying such calls. "Agreement B" also delays a district 67 call by providing that any winter water remaining in an account after May 1 of the following compact year automatically becomes summer stored water, which must be then exhausted before that ditch may place a call above John Martin.

against all rights now or hereafter decreed to water users diverting upstream from John Martin dam on the basis of relative priorities in the same manner in which their respective priority rights were administered by Colorado before John Martin reservoir began to operate and as though John Martin dam had not been constructed.

■ The fact that the Compact does not specifically incorporate the Operating Plan and its system of individual accounts for the benefit of Kansas and Colorado is not fatal. ARCA's decision to transfer the water into the accounts in a manner which parallels releases from the reservoir under the Compact's no-call provision substantially affords the benefit contemplated by the Compact for upstream junior priorities.

■ Highland and Nine Mile note that conservation water under the Operating Plan is "released" into the accounts and kept in storage rather than being "applied promptly to beneficial use," as provided by Article V E(2). They assume that use of the word "release" in the context of account transfer must trigger the requirement of prompt beneficial use applicable to reservoir releases. While we agree with Highland and Nine Mile that storage is not, of itself, a beneficial use of water,[11] although water impounded can be beneficially applied to fish, recreational, and flood control uses therein,[12] we do not agree that the water transferred into the accounts must then be released from the reservoir immediately and applied to beneficial use.

■ Article V E(2) of the Compact provides that ARCA may authorize "storage ... downstream" prior to actual beneficial use. The framers of the Compact therefore anticipated that conservation pool storage could be followed by intervening storage prior to actual beneficial use. Thus, Compact language demonstrates that prompt use does not mean immediate use. The requirement of prompt beneficial use was intended to ensure that actual releases of reservoir water are utilized efficiently and not wasted. When read as a whole with other provisions, this provision does not prevent ARCA from invoking its Article VIII powers to adopt and implement the Operating Plan, by which conservation pool water is transferred into individual accounts for subsequent beneficial use, for the benefit of both Kansas and Colorado, in order to avoid a race to empty reservoir conservation storage.

■ Promptness does not preclude reasonableness. The Compact concept of prompt use is illuminated by the Supreme Court's recognition in *Nebraska v. Wyoming,* 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945), that a diversion is to be "followed by an application *within a reasonable time* of the water to a beneficial use." *Id.* at 614, 65 S.Ct. at 1349 (emphasis added). The fundamental function of a water storage right is to divert into storage, followed by beneficial use at a reasonable time in the future.

■ Utilization of John Martin Reservoir in a more efficient manner is within the purposes of the Compact. Article I recites two major Compact objectives. The first is to settle the apportionment dispute between the states. The second includes realizing "the benefits arising from the construction, operation, and maintenance of the United States of John Martin Reservoir project for water conservation purposes." This second purpose is forwarded by the Operating Plan's allowance for individual accounts in a manner that reasonably provides for beneficial use to occur later, without the necessity of constructing additional downstream storage.

---

11. *See Handy Ditch Co. v. Greeley & Loveland Irrigation Co.,* 86 Colo. 197, 199, 280 P. 481, 481 (1929).

12. *See May v. United States,* 756 P.2d 362, 371 (Colo.1988) (fishing), *Three Bells Ranch Assocs. v. Cache La Poudre Water Users Ass'n,* 758 P.2d 164, 173 (Colo.1988) (recreation, fishing, wildlife habitat), *Zigan Sand & Gravel v. Cache La Poudre Water Users Ass'n,* 758 P.2d 175, 182 (Colo.1988) (wildlife habitat, enhancement of residential environment), *Pueblo West Metro. Dist. v. Southeastern Colo. Water Conservancy Dist.,* 689 P.2d 594, 603 (Colo.1984) (flood control).

Colorado law favors efficient water management, optimum use, and priority administration.[13] The record before us discloses the role of Colorado water officials in verifying that water is actually placed to beneficial use by the downstream ditch companies under their water rights.[14]

### C.

We conclude that the water court was correct in ruling that Colorado priority administration resumes when ARCA declares the conservation pool to be exhausted by means of measured transfers into individual accounts for the benefit of Kansas and Colorado under the Operating Plan. The conservation pool water was intended under the Compact to be used by Kansas and the downstream ditches in Colorado. Giving effect to Highland and Nine Mile's argument would prolong the Compact's no-call provision to the detriment of the purposes of the Compact, other water users, and Colorado priority administration or, in the alternative, would require resort to the prior practice which promoted inefficient releases from the reservoir.[15]

In reaching this result, based on the record before us, we are confident that Highland, Nine Mile, and other Colorado water users upstream from John Martin Reservoir benefit from the Operating Plan, as do the downstream senior priorities of water district 67. In receiving benefits from Colorado's Compact participation that they would not otherwise have under Colorado law, Highland and Nine Mile cannot prevent Colorado from reasonably acting on behalf of the common good of Colorado water users in Compact administration.[16]

Highland and Nine Mile would have us set aside the Engineer's curtailment orders. But the duties of state water officials require them to administer the waters of the state in accordance with decreed priorities. § 37–92–301(3), 501, 503, 15 C.R.S. (1990). A decree does not confer but, rather, confirms the existence of a water right arising from the appropriation of state waters and governs administration of the water right in priority[17] vis-a-vis other water rights. *Cresson Consol. Gold Mining & Milling Co. v. Whitten*, 139 Colo. 273, 283,

13. *See Alamosa–La Jara Water Users Protection Ass'n v. Gould*, 674 P.2d 914, 935 (Colo.1983) (regarding rules and regulations with regard to the Rio Grande Compact). *See also* § 37–92–501(2)(e), 15 C.R.S. (1990) ("[t]hat all rules and regulations shall have as their objective the optimum use of water consistent with preservation of the priority system of water rights.").

14. William F. Howland, engineering technician for Colorado Division of Water Resources, Division II, who receives orders for John Martin water releases and gives orders to Corps of Engineers personnel to open, close or adjust the gates of John Martin, testified that he visited all of the ditches in water district 67 during the 1993 irrigation season and observed them beneficially using water. Further guardianship regarding beneficial use of John Martin waters was demonstrated by Steven Witte, Division Engineer for Water Division II, with respect to account water. Witte testified that Amity Canal had been the first ditch to request a physical release of account water (that would have triggered the 1993 summer season and release of conservation water into accounts). But Witte had rejected that request because he was not convinced the water would be put to beneficial use. The second request came from Keesee Ditch. Witte was satisfied only after personal

physical inspection that Keesee Ditch's request for water was responsive to a legitimate need for the water on April 1.

15. Duane Helton testified that the conservation pool is increased by the Operating Plan in that the downstream ditch companies cannot demand releases of river flows during the winter storage period, and the downstream ditch companies and Kansas cannot call for releases of storage flow during the summer flow period.

16. Highland and Nine Mile do not rely on the terms of a stipulation entered as part of a settlement in a water rights judgment and decree, such as that enforced in *United States v. Northern Colo. Water Conservancy Dist.*, 608 F.2d 422, 430 (10th Cir.1979). Their contentions wholly depend upon interpretation of the Compact.

17. Its priority is the essential element of a Colorado water right. Under the decreed priority, the owner or beneficiary of a water right is entitled to effectuate capture, possession, and control of a specified quantity of water from the physically available, decreed source of supply at an identified point of diversion for application to beneficial use to the exclusion of all other uses not then operating in decreed priority. *See Navajo Dev. Co. v. Sanderson*, 655 P.2d 1374, 1377–78 (Colo.1982).

338 P.2d 278, 283 (1959). Security for the rights of Colorado water users largely depends upon the sound exercise of the Engineer's diversion curtailment enforcement power. Use of these powers by state officials in appropriate circumstances is contemplated by the Compact. Article VI A(2) provides that:

Except as otherwise provided, nothing in this compact shall be construed as supplanting the administration by Colorado of the rights of appropriators of waters of the Arkansas river in said state as decreed to said appropriators by the courts of Colorado, nor as interfering with the distribution among said appropriators by Colorado, nor as curtailing the diversion and use for irrigation and other beneficial purposes in Colorado of the waters of the Arkansas river.

The water court found that out-of-priority diversions by Highland and Nine Mile continued at various times between April 30 and October 31, 1993, and deprived downstream users of a total of 7,832.1 acre-feet of water, causing material injury to senior rights. The court found that the Operating Plan did not deprive Highland and Nine Mile of the benefit of the no-call provision of the Compact but only affected its timing and the procedure for its implementation. As these findings are supported by the record and the applicable law, we will not disturb them on appeal.

The assertion of Highland and Nine Mile that the U.S. Army Corps of Engineers failed to approve the Operating Plan, thereby rendering the Plan void, is not correct. The Corps has long been aware of the Operating Plan and has operated John Martin Reservoir continuously in accordance therewith. By its conduct, the Corps has approved the Plan. Reliance placed thereon by Colorado and Kansas is justified. *Cf. Town of Estes Park v. Northern Colo. Water Conservancy Dist.*, 677 P.2d 320, 327–28 (Colo.1984).

IV.

Accordingly, we affirm the water court's judgment enjoining Highland and Nine Mile from continuing to violate the curtailment orders of the Engineer and requiring them to pay an award of costs and reasonable attorney fees.