**In re COMMUNICATION DYNAMICS, INC. et al., Debtors.**

**CDI Trust, Plaintiff,**

**v.**

**U.S. Electronics, Inc., n/k/a ICX Global, Inc., Defendant.**

**Bankruptcy No. 02–12753 (MFW).
Adversary No. 05–30276 (MFW).**

United States Bankruptcy Court, D. Delaware.

Feb. 21, 2008.

Gianclaudio Finizio, Jeffrey M. Schlerf, Eric Michael Sutty, The Bayard Firm, Wilmington, DE, Scotta Edelen McFarland, Pachulski Stang Ziehl Young & Jones PC, Los Angeles, CA, for Debtors.

## OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the Motion for Summary Judgment filed by the CDI Trust (the "Trust") on Counts I through IV of its Complaint seeking to collect $4,435,725 due under two notes from U.S. Electronics, Inc., n/k/a ICX Global, Inc. ("ICX"). ICX opposes the Motion. For the reasons stated below, the Court will deny the Motion.

## I. BACKGROUND

On May 8, 2002, Communications Dynamics, Inc. ("CDI") and its subsidiary, U.S. Electronics, Inc. ("USE Delaware") entered into an asset purchase agreement (the "APA") with USE Acquisition, LLC (the predecessor to ICX) pursuant to which ICX acquired certain business assets of USE Delaware for a purchase price of $25 million. ICX paid $20 million in cash and delivered two notes (the "USE Notes") in the face amount of $5 million.

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

At about the same time,[2] ICX, CDI and another of CDI's subsidiaries, TVC Communications, Inc. ("TVC"), executed a Distribution Agreement pursuant to which TVC obtained the exclusive right to market and committed to purchase a minimum amount of the product now manufactured by ICX. Pursuant to the Distribution Agreement (and the USE Notes), ICX gave a discount to TVC in the amount of 25 cents for each unit it sold, which discount was credited against the principal due by ICX under the USE Notes.

On September 23, 2002, CDI and several of its affiliates, including TVC (collectively the "Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code. Because TVC had purchased substantially fewer units than it was obligated to buy under the Distribution Agreement, ICX expressed concern about TVC's ability to comply with the Distribution Agreement and the preclusive effect TVC's exclusivity rights had in allowing ICX to mitigate its damages. Given the size of the cure payment (approximately $1.3 million), and ICX's expressed desires, the Debtors agreed to reject the Distribution Agreement and enter into a new non-exclusive manufacturer's representative agreement (the "NEMRA"). A Motion was filed seeking authority for that arrangement, which was approved by the Court on May 21, 2003.

On July 28, 2003, within the time set by the Court to file any rejection damages claims, ICX filed a secured proof of claim in the amount of $4,835,000 and an unsecured proof of claim in the amount of $10,130,000 for its rejection damages. ICX asserts that the secured claim represents the portion of its rejection damages which is subject to setoff or recoupment against the sums it owes on the USE Notes.

On February 26, 2004, the Court confirmed the Debtors' plan of reorganization (the "Plan"). Pursuant to the Plan, the Senior and Subordinated Lenders entered into a settlement (the "Global Settlement Agreement") with the Debtors and the Creditors' Committee. As part of the Plan, the Debtors transferred certain property and rights to the Trust, including the USE Notes, to collect and distribute to creditors.

On November 30, 2005, the Trust filed a complaint (the "Complaint") against ICX seeking (1) an accounting and turnover of the amounts due under the USE Notes under § 542(a); (2) to compel ICX to pay the full value of the USE Notes under § 542(b); (3) recovery of damages for ICX's breach of the USE Notes; (4) a declaratory judgment that ICX has no right of setoff against the USE Notes; (5) disallowance of ICX's claim for damages for rejection of the Distribution Agreement; and (6) subordination of ICX's claims to unsecured status. On January 13, 2006, ICX filed an answer denying the allegations of the Complaint and asserting certain affirmative defenses, including the right of setoff.

On June 1, 2007, the Trust filed its motion for summary judgment. ICX filed its brief in response on July 16, 2007. On August 10, 2007, the Trust filed its reply. On August 17, 2007, a notice of completion of briefing was filed. The matter is ripe for decision.

## II. JURISDICTION

The Court has subject matter jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 & 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (K), & (O).

---

**2.** The Distribution Agreement was executed twelve days later on May 20, 2002.

## III. DISCUSSION

### A. Standard for Granting Summary Judgment

The Court should grant a summary judgment motion "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See, e.g., Robeson Indus. Corp. v. Hartford Accident & Indem. Co.*, 178 F.3d 160, 164 (3d Cir.1999). The movant must establish that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Facts that may affect the outcome of a suit are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995).

All facts are viewed and all reasonable inferences are drawn "in the light most favorable" to the non-movant. *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995). *See also Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348; *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). "[T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (*quoting* Fed.R.Civ.P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* "[C]ourts may not make credibility determinations or weigh the evidence when confronted with a motion for summary judgment." *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir.1998).

### B. Does the Contract Preclude Setoff or Recoupment?

ICX asserts that it has the right to set off or recoup its damages for rejection of the Distribution Agreement against sums it owes on the USE Notes.

The Trust contends that the parties' contracts preclude the assertion of setoff or recoupment by ICX. Specifically, the Trust argues that the USE Notes state that they shall be paid in cash. (App. to Trust's Br. A0303) ICX disagrees, noting that the USE Notes and the Distribution Agreement expressly permit ICX to "pay" the USE Notes with the 25 cent discount for each unit sold by TVC. (App. A0303, A0342) Therefore, ICX argues that the parties' contracts specifically permitted setoff.

The Trust cites section 6(a) of the Distribution Agreement, which it asserts establishes that setoff was not intended by the parties. (App. AO343) According to the Trust that provision sets forth the only remedies to which ICX is entitled on TVC's default of the minimum purchasing requirements: namely, abatement of interest on the USE Notes and an increase in TVC's purchase requirements in future periods. (App. A0343) The Trust argues that the Distribution Agreement does not permit other remedies, such as setoff.

ICX counters that paragraph 6 is not the provision governing remedies for breach of the Distribution Agreement, rather it provides remedies for TVC's failure to buy the minimum required units. (App. A0343) Instead, ICX contends that paragraph 13 provides the remedies for breach of the Distribution Agreement. (App. A0347–48) That provision expressly reserves all remedies to which ICX may be entitled in the event of a breach of the Distribution Agreement by TVC. (App.

A0347–48) That, ICX argues, includes the rights of setoff and recoupment.

Further, ICX argues that the rights of setoff and recoupment are remedies that are available to creditors independent of any contractual provision that allows setoff. *See, e.g., In re Holford*, 896 F.2d 176, 178 (5th Cir.1990) (finding that lessee's withholding of rent to offset losses caused by landlord's fraud was recoupment, not setoff, and was permitted notwithstanding lack of contractual right to withhold those payments); *In re B & L Oil Co.*, 782 F.2d 155, 159 (10th Cir.1986) (holding that "application of an equitable doctrine [such as recoupment] should not depend on whether the parties expressly anticipated the problem" and allowing recoupment even in the absence of an express contractual provision allowing same); *In re HQ Global Holdings, Inc.*, 290 B.R. 78, 82–83 (Bankr. D.Del.2003) (concluding that the presence of an express clause providing for recoupment is not a prerequisite to the application of that doctrine). Therefore, ICX asserts that setoff and recoupment are not barred by the parties' agreement.

■ The Court agrees with ICX's last argument. Setoff and recoupment are not dependent on the parties' contract; rather, they are equitable remedies available independent of any contractual remedy. *See, e.g., University Medical Center v. Sullivan (In re University Medical Center)*, 973 F.2d 1065, 1080 (3d Cir.1992) (noting that "an express contractual right is not necessary to effect a recoupment") (*citing Holford*, 896 F.2d at 178).

■ Further, the Court finds that, contrary to the Trust's argument, the parties' contracts in this case do not preclude the application of setoff or recoupment. Paragraph 13 of the Distribution Agreement expressly reserves all remedies in favor of ICX on breach. (App. A0347–48) In addition, paragraph 6 entitles ICX to damages

if TVC purchases less than 80% of the required purchases. (App. A0343) Because the Distribution Agreement was rejected in the first year of the five year contract, it is safe to conclude that TVC purchased less than 80% of the requirements thereby entitling ICX to damages. Therefore, the Court concludes that the remedies of setoff and recoupment are available.

### C. Setoff

ICX asserts that it has the right to set off the debt it owes to CDI under the USE Notes against the damages it suffered as a result of the rejection of the Distribution Agreement. It relies on section 553 of the Bankruptcy Code which provides, in pertinent part, that the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case." 11 U.S.C. § 553(a) (2007).

The Trust denies that ICX has any right of setoff.

### 1. Setoff is Permissive, Not Mandatory

The Trust argues preliminarily that granting setoff is permissive rather than mandatory. *See, e.g., Cumberland Glass Mfg. Co. v. De Witt*, 237 U.S. 447, 455, 35 S.Ct. 636, 59 L.Ed. 1042 (1915) (application of setoff rights applies only "as established in common law and equitable procedure"); *Cohen v. Sav. Bldg. & Loan Co. (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 896 F.2d 54, 57 (3d Cir.1990) (equitable right of setoff is permissive, not mandatory, and cannot be invoked where it would offend the general principles of equity); *United States v. Norton*, 717 F.2d

767, 772 (3d Cir.1983) (holding that "when [setoff is] properly invoked before a court, [its application] rests in the discretion of that court, which exercises such discretion under the general principles of equality.") (*quoting* 4 *Collier on Bankruptcy* ¶ 553.02 at 553–11 (Lawrence P. King ed., 15th ed.1983)).

The cases cited by the Trust are unpersuasive. In *Cumberland Glass*, a creditor had raised (as a defense to a suit against it by a former bankrupt) that the claim should have been set off against a claim it had in the bankruptcy composition case.[3] 237 U.S. at 450–51, 35 S.Ct. 636. The creditor argued that the bankrupt had a duty to seek setoff in the bankruptcy case and, because it did not, the bankrupt had forfeited the right to pursue its claim against the creditor. *Id.* It was in this context that the Supreme Court concluded that the setoff provision of the 1898 Bankruptcy Act was permissive, not mandatory, stating that the "[setoff] section is not self-executing, but its benefit is to be had upon the action of the district court only when it is properly invoked...." *Id.* at 457, 35 S.Ct. 636. Because neither the bankrupt nor the creditor had asked for setoff, the Supreme Court concluded that it had not occurred and the bankrupt was free to pursue its claim against the creditor. *Id.* at 459, 35 S.Ct. 636. The Court stated that this was consistent with the right of setoff generally, where a party must affirmatively seek to have a claim against it set off against a claim it has or the claims will be separately adjudicated. *Id.* at 455–56, 35 S.Ct. 636.

In *Bevill* the Third Circuit stated that the Bankruptcy Code setoff "provision is permissive rather than mandatory, and cannot be invoked in a case where the general principles of setoff would not justify it." 896 F.2d at 57. In response to the debtor's assertion that the creditor's right of setoff should be denied because it had unclean hands, however, the *Bevill* Court concluded that there was no equitable reason to deny the creditor's right of setoff. *Id.* at 61. In fact, the Court in *Bevill* allowed the creditor to set off its breach of contract claim against the debtor's claim for breach of another contract, finding they were mutual debts, although it did not allow the creditor to set off its claim against property of the debtor which the creditor held in trust for the debtor, finding that the creditor's obligation to return the debtor's property was not a debt. *Id.* at 57–58 (*citing In re Windsor Commc'ns Group, Inc.*, 79 B.R. 210, 217 (E.D.Pa. 1987) (concluding that creditor that had converted debtor's property was not entitled in equity to a right of setoff in part because the conversion did not create a "debt")).

Finally, the *Norton* case is not instructive because in that case the IRS had exercised its right of setoff without first seeking relief from the automatic stay and after the debtor's chapter 13 plan had been confirmed providing for payment of the IRS's claim over three years. 717 F.2d at 769, 774.

■ The Court concludes from those cases that a creditor's right of setoff may be denied only if there is some basis in equity to do so. *See, e.g., Bevill*, 896 F.2d at 57–59 (denying setoff against property held in constructive trust for the estate); *Norton*, 717 F.2d at 771, 774 (denying setoff where creditor's action violated automatic stay and terms of confirmed plan); *Windsor*, 79 B.R. at 217 (denying setoff

---

**3.** *Cumberland Glass* involved the application of section 68a of the Bankruptcy Act of 1898 to composition proceedings which were similar to today's chapter 11 reorganization cases. 237 U.S. at 452–54, 35 S.Ct. 636.

where creditor had converted property of the estate).

The Trust does not argue in this case that ICX has engaged in any specific inequitable conduct. Rather, the Trust simply argues that it would be "inequitable" to allow ICX to set off its claim against the amounts owed by it. The Trust notes that the USE Notes are the bulk of the assets which the Debtors transferred to the Trust for the benefit of the general unsecured creditors. Even if the Trust collects on those Notes, the unsecured creditors in this case will receive less than 2% of their claims. Thus, the Trust argues that ICX should not be permitted to exercise its setoff rights and deprive the unsecured creditors of a substantial portion of their expected recovery.

The Court rejects this argument. Equity does not mandate that one creditor lose rights it has under state law and the Bankruptcy Code simply because other creditors will benefit by that loss. In fact, the equitable doctrines of setoff and recoupment expressly permit the result which the Trust seeks to avoid. *See, e.g., B & L Oil,* 782 F.2d at 157 ("In bankruptcy, both recoupment and setoff are sometimes invoked as exceptions to the rule that all unsecured creditors of a bankrupt stand on equal footing for satisfaction. Recoupment or setoff sometimes allows particular creditors preference over others."); *Lee v. Schweiker,* 739 F.2d 870, 875 (3d Cir.1984) ("Setoff, in effect, elevates an unsecured claim to secured status, to the extent that the debtor has a mutual, prepetition claim against the creditor."); *Express Freight Lines, Inc. v. Kelly (In re Express Freight Lines, Inc.),* 130 B.R. 288, 291 (Bankr.E.D.Wis.1991) (noting that "Bankruptcy Courts have consistently allowed setoff even though this right is 'at odds with the fundamental bankruptcy principle of equality of distribution among

creditors because it permits a creditor to obtain full satisfaction of a debt by extinguishing an equal amount of the creditor's obligation to the debtor.' Courts have allowed this right because without it, it would be unfair to require a creditor to pay in full what is owed to the debtor only to receive a portion, if that, of its claim against the debtor.")

The Trust asserts nonetheless that ICX is, in fact, guilty of inequitable conduct in this case sufficient to warrant disallowance of its setoff rights. As support the Trust asserts that ICX failed to advise the Debtors, the creditors, or the Court of its setoff rights until after the Debtors had rejected the Distribution Agreement. It points to the Motion for approval of the rejection, in which the Debtors assert that the contract should be rejected to avoid the cure claim of $1.3 million. (App. A0378) The Trust contends that if the Debtors knew that ICX would assert a setoff of almost $5 million, they would not have rejected the Distribution Agreement.

The Court rejects this argument. First, ICX had no duty to advise anyone of its setoff claims before the Distribution Agreement was rejected. The rejection order (as is typical) provided that any rejection damages claim could be filed after the effective date of the rejection (in this case 70 days later). ICX filed its rejection damages claim within that deadline. Further, ICX had no duty to advise the Debtors of the effect of the rejection of the Distribution Agreement on the Debtors or their estates. The Debtors were aware of the terms of the APA, the USE Notes, and the Distribution Agreement and had counsel available to advise them of the effect of the rejection. Therefore, the Court finds no basis to conclude that ICX acted inequitably in failing to advise the parties or the Court of the effect that rejection of the

Distribution Agreement would have on the estates.[4]

Further, the Court is not convinced that the Debtors' decision to reject the Distribution Agreement would have been different if they had known of ICX's rights of setoff. As noted, the Debtors owed ICX $1.3 million at the time and were seriously in default of the Distribution Agreement. If the Debtors had not rejected the Agreement, but had instead assumed the Agreement, they would have had to pay the cure amount and perform the Agreement (or pay an administrative claim for any post-assumption breach of that Agreement). 11 U.S.C. § 365(b)(1)(A) & (g)(2). The Court is not convinced that the Debtors would not have rejected the Agreement, even knowing that ICX would have a setoff claim.

### 2. Both Claims Must Be Valid

■ There is no dispute that there is an obligation owing by ICX under the USE Notes in the amount of $4,435,725. The Trust asserts that, in order to set off the USE Notes obligation against its rejection damages claim, ICX has the burden of establishing that it has a rejection damages claim. The Trust contends that ICX has failed to establish that it has such a claim.

ICX responds that there is no dispute that it has a rejection damages claim and that only the amount is in dispute. It argues that the rule which precludes the recovery of uncertain and speculative consequential damages "only applies to situations where the *fact of damages* is uncertain, not where the amount is uncertain."

*Vanderbeek v. Vernon Corp.*, 50 P.3d 866, 873 (Colo.2002) (emphasis added). ICX argues further that such a disputed material fact precludes the granting of the Trust's summary judgment motion. *See, e.g., Elsmere Park Club Ltd. P'ship v. Town of Elsmere*, 771 F.Supp. 646, 651 (D.Del.1991) ("Because genuine issues of material fact still exist on [creditor's] claim for damages, [the court] will deny both parties' motions for summary judgment on the damages issue.").

The Court agrees with ICX. The rejection of the Distribution Agreement resulted in a breach of that Agreement as of a time immediately before the petition date by operation of law. 11 U.S.C. § 365(g)(1). ICX's expert has prepared a report detailing the amount of its claim. (App. A0395–A0473) While the Trust may disagree with that assessment, it may not obtain summary judgment on that point simply by disputing it. *See, e.g., Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348.

The Trust argues further, however, that ICX suffered no damage because the Debtors entered into the NEMRA at the same time they rejected the Distribution Agreement. The Trust argues that the parties intended the NEMRA to replace the Distribution Agreement and thereby to eliminate any claim that ICX would have to rejection damages.

ICX disagrees with the Trust's analysis. It notes that the NEMRA itself explicitly states that it is not intended to replace the Distribution Agreement and preserves ICX's claims under the Distribution Agreement. (App. AO372)

---

4. The Trust also asserts that ICX "continued its deception" by not objecting to the Global Settlement Agreement or confirmation of the Plan, whereby the USE Notes were conveyed to the Trust. (Trust's Br. 8) However, the Court notes that ICX filed its setoff claim in July, 2003, long before the Global Settlement Agreement was approved on February 17, 2004, and the Plan was confirmed on February 26, 2004. Therefore, the parties were aware (or should have been aware) of ICX's asserted setoff rights at the time the Global Settlement Agreement and the Plan were negotiated and approved.

The Court agrees with ICX. The Trust's argument that the parties intended the NEMRA to replace the Distribution Agreement and intended that ICX would have no right to rejection damages is belied by the express language of the parties' agreement. Paragraph 13 of the NEMRA states in relevant part that:

[TVC] and [ICX] hereby agree and acknowledge that this Agreement is not a modification, amendment or addition to the Distribution Agreement and that the Distribution Agreement shall remain subject to [TVC's] rights and [ICX's] rights under the Bankruptcy Code.

(App. AO372)

Therefore, the Court concludes that the NEMRA does not preclude ICX from asserting damages resulting from the rejection of the Distribution Agreement. Consequently, the Court finds that ICX can assert its rejection damages claim but that determination of the amount of that claim is disputed and mandates denial of the Trust's motion for summary judgment.

3. *Both Claims Must Arise Pre-petition*

a. *Rejection Damages Claim*

█ The Trust contends that notwithstanding sections 365(g) and 502(g) [5], rejection damages may not be treated as a pre-petition claim and set off against a pre-petition debt owed to the Debtors as a matter of law. *See, e.g., In re Delta Air Lines, Inc.*, 341 B.R. 439, 448 (Bankr. S.D.N.Y.2006) (concluding that §§ 553 and 365 were not meant to enhance a creditor's rights and, therefore, the claim arising from a post-petition rejection of a contract could not be set off against a pre-petition obligation owing to the debtor).

ICX argues that the *Delta* decision is incorrect, runs counter to all other courts that have addressed the issue, and has been criticized by the commentators. ICX asks this Court to reject the reasoning of the *Delta* case and, instead, to follow the commentators and courts which have concluded rejection damages claims are pre-petition claims which can be set off against pre-petition debts. *See, e.g., Public Serv. Co. of New Hampshire v. New Hampshire Elec. Coop., Inc. (In re Public Serv. Co. of New Hampshire)*, 884 F.2d 11, 15 (1st Cir.1989) (stating that "[w]e acknowledge that, when triggered by a timely postpetition rejection, the relation-back rule serves to transform a future action for breach of an executory contract into a prepetition claim subject to setoff."); *Express Freight Lines*, 130 B.R. at 293 (concluding that lease rejection damages claim could be set off against unmatured debt represented by note); *In re Mace Levin Assocs., Inc.*, 103 B.R. 141, 143–45 (Bankr.N.D.Ohio 1989) (holding that landlord could set off its rejection damages claim against debtor's claim for damages caused by landlord's earlier failure to deliver possession of the premises). *See generally* Daniel W. Linna, Jr., *Contract Rejection Damages May Not Be Eligible For Setoff After All, Says Delta Court*, Am. Bankr.Inst. J. Sept. 25, 2006, at 51; 3 *Norton Bankruptcy Law & Practice* 2d § 63:4 (William L. Norton, Jr., ed., 2006); 5 *Collier on Bankruptcy* ¶ 553.03[1][i] (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev.2004).

---

5. Section 365(g) provides in relevant part that "the rejection of an executory contract ... of the debtor constitutes a breach of such contract ... (1) if such contract ... has not been assumed ... immediately before the date of the filing of the petition." 11 U.S.C. § 365(g). Section 502(g) provides in relevant part that a "claim arising from the rejection, under section 365 of this title ... of an executory contract ... of the debtor that has not been assumed shall be determined, and shall be allowed ... or disallowed ... the same as if such claim had arisen before the date of the filing of the petition." 11 U.S.C. § 502(g).

The Court agrees with ICX that the reasoning in *Delta* is unpersuasive. Preliminarily, the Court notes that the conclusion of the *Delta* Court that section 553 does not allow the setoff of rejection damages against pre-petition claims against the creditor is dicta. The Court in *Delta* found that the claim against which the creditor sought to set off its rejection damages claim was not even a "debt" because under the contract the creditor never owed the debtor any money but was only obligated to give the debtor a credit. 341 B.R. at 450. Further, the *Delta* Court found that even if it were a debt, it did not arise pre-petition. *Id.* Therefore, the *Delta* Court's determination that rejection damages cannot be set off against pre-petition claims is unnecessary to the case and mere dicta. *See, e.g., New Port Largo, Inc. v. Monroe County,* 985 F.2d 1488, 1500 n. 7 (11th Cir.1993) (Edmonson, J., concurring) ("For good or for evil, opinion-writing judges—unlike legislators—can make cases decide no more than the cases present. For example, no matter how often or how plainly a judicial panel may put in its opinion that 'we hold X,' 'X' is not law and is not binding on later [courts] unless 'X' was squarely presented by the facts of the case....").

In addition, the Court disagrees with the premise of the *Delta* Court's holding that section 553 unambiguously precludes any other section of the Bankruptcy Code from "affecting" the right of setoff that a creditor may have under state law as of the petition date. 341 B.R. at 443. Based on that premise, the *Delta* Court concluded that sections 365(g) and 502(g), which provide that a rejection damages claim is deemed a pre-petition claim, cannot be considered in determining whether such a claim can be set off against another pre-petition claim under section 553. *Id.* at 446.

This interpretation of section 553 could lead to absurd (and clearly unintended) results. One commentator notes that a strict reading of the *Delta* decision could result in rejection damages being elevated to administrative status in direct contravention of Congress' intent as expressed in section 365(g). Vincent J. Roldan, *Delta Court Holds Rejection Damages Cannot Be Offset Against Prepetition Debt To Debtor,* Pratt's J. Bankr.L. (Mar.2007). Mr. Roldan suggests that because the *Delta* Court ruled that rejection damages claims are not pre-petition claims,

> a court following the reasoning in *Delta* may rule that the rejection damage claim 'arose' post-petition, and so it may only allow the Creditor to offset the rejection damage claim against a post-petition account payable. This would essentially allow the Creditor to enjoy post-petition administrative claim treatment for its rejection damage claim. The result would undermine the clear purpose of Section 365(g), which is to treat rejection damage claims as pre-petition claims.

*Id.*

Similarly, it would appear that the *Delta* reasoning would not permit a landlord to set off a security deposit which it had received from the debtor pre-petition against its rejection damages claims because "[t]he rejection claim did not 'arise' pre-petition in any sense of the word." 341 B.R. at 446. Presumably then the landlord would be obligated to return the security deposit to the debtor and collect only cents on the dollar on its rejection damages claim (which is already reduced by section 502(b)(6) to one year or 15% of the remaining term).

Another commentator argues that the reasoning in *Delta* would preclude the setoff of unmatured or contingent claims (notwithstanding the inclusion of such claims

in the definition of "claim" under section 101 of the Code) because ordinarily such claims cannot be used as a setoff or counterclaim under state law. *See* Linna, *Contract Rejection Damages May Not Be Eligible For Setoff After All, Says Delta Court, supra* at 53. Mr. Linna contends that because a strict reading of section 553 leads to absurd results that are clearly at odds with the Bankruptcy Code, the courts should conclude that section 553 is ambiguous. As a result, he asserts that the courts should be free to consider the impact of other sections of the Code and the policy of the Code as a whole in interpreting section 553. *Id.*

The *Delta* Court itself acknowledged that "[t]he one exception to the plain and ordinary meaning rule may arise in the rare case where the result of a literal application of the statutory language to particular facts is so bizarre and demonstrably counterintuitive that reasonable minds must agree that the statute cannot be construed to mean what it says." 341 B.R. at 445 (*citing Bob Jones Univ. v. United States,* 461 U.S. 574, 586, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) ("It is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute."); *Comm'r of Internal Revenue v. Brown,* 380 U.S. 563, 571, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965) ("Unquestionably the courts, in interpreting a statute, have some 'scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results ... or would thwart the obvious purpose of the statute.' ") (citation omitted)).

This Court agrees with the commentators and the other Courts who have interpreted section 553. Because adopting the literal meaning of "affect" in applying section 553 would lead to absurd results, the Court declines to follow the *Delta* decision interpreting that term literally. Rather, the Court concludes that section 553 is ambiguous and must be considered together with other sections of the Code, specifically sections 365(g), 502(g) and 101. Congress has defined "debt" and "claim" broadly in section 101 of the Code to include unmatured, contingent, disputed, and unliquidated claims. Sections 365(g) and 502(g) provide that a rejection damages claim shall be treated as if it arose pre-petition. Consequently, the Court concludes that for purposes of section 553, a rejection damages claim is a pre-petition claim subject to setoff against any pre-petition debt owed by the creditor to the debtor.

■ There is an alternative basis for the Court's conclusion. As one commentator notes, the Bankruptcy Code generally looks to state law to determine the *substance* of any claim that a creditor has but looks to the Bankruptcy Code itself to determine the effect of that claim, including *when* it arises. *See* Linna, *Contract Rejection Damages May Not Be Eligible For Setoff After All, Says Delta Court, supra* at 52. Sections 365(g) and 502(g) do not affect the substance of a rejection damages claim but only specify when it arises. Therefore, the Court concludes that sections 365(g) and 502(g) must be considered in determining what offsets are appropriate under section 553.

This conclusion is particularly appropriate in this case because the rejection damages claim is based on a breach of a written agreement between the parties. Many courts have held that a claim (albeit contingent) which is based on a written agreement arises at the time the agreement is executed even though the breach of the agreement does not occur until later. *See, e.g., Mace Levin,* 103 B.R. at 144 (stating

that "the characterization of rejection claims as pre-petition obligations is not simply a legal fiction created by sections 365(g) and 502(g). The Lease was entered into pre-petition and by virtue of this fact imposed pre-petition obligations on both parties."). In this case the Distribution Agreement was executed pre-petition and ICX had a claim for enforcement of that agreement at the time it was executed. Therefore, it is not absurd to conclude that the claim for rejection of that Agreement is a pre-petition claim subject to setoff against any pre-petition obligation owed to the Debtors.

Consequently, the Court concludes that ICX's rejection damages claim is a pre-petition claim for purposes of setoff under section 553 of the Bankruptcy Code.

#### b. *Obligation under USE Notes*

■ The Trust asserts that even if the rejection damages claim is a pre-petition claim by operation of sections 365(g) and 502(g), the estate's claim on the USE Notes is a post-petition claim because payment on the Notes was not due until after the petition date. It cites *Avellino & Bienes v. M. Frenville Co., Inc., (In re M. Frenville Co., Inc.)*, 744 F.2d 332, 335–36 (3d Cir.1984) for the proposition that a debt arises when the cause of action underlying it accrues under applicable state law. From that the Trust argues that a debt arises only when a right to payment on that debt arises. (Trust's Br. 16) In this case, the Trust contends that because ICX's default on payment of interest on the USE Notes occurred post-petition, the Trust's right to payment accrued post-petition. Even if there had been no default in payment of interest, the Trust notes that the USE Notes did not mature until May 20, 2007. Thus it argues that the Notes are a post-petition obligation which cannot be set off against the rejection damages

which are deemed to be a pre-petition claim. *See, e.g., Schweiker*, 739 F.2d at 875 (stating that "pre-petition claims against the debtor cannot be setoff [sic] against post-petition debts to the debtor.").

ICX disagrees, contending that a claim arises when the right to payment accrues, not when the payment is due. *See, e.g., In re Telephone Warehouse, Inc.*, 259 B.R. 64, 69 (Bankr.D.Del.2001) (*citing United States v. Gerth*, 991 F.2d 1428, 1433 (8th Cir.1993) (concluding that "[f]or setoff purposes, a debt arises when all transactions necessary for liability occur, regardless of whether the claim was contingent, unliquidated, or unmatured when the petition was filed."); *In re Young*, 144 B.R. 45, 46–47 (Bankr.N.D.Tex.1992) (stating that "[s]etoff is permitted when, at the time the bankruptcy petition is filed, the debt is absolutely owing but is not presently due, or when a definite liability has accrued but is not yet liquidated."); *In re Nickerson & Nickerson, Inc.*, 62 B.R. 83, 85 (Bankr. D.Neb.1986) (holding that "[t]he right to setoff may be asserted in bankruptcy even though one of the debts involved is absolutely owing but not presently due when the petition is filed."); *Traders Bank of Kansas City v. Stonitsch (In re Isis Foods, Inc.)*, 24 B.R. 75, 76 (Bankr.W.D.Mo.1982) (finding that where "there can be no question about the existence of the debt, and the fact that it was 'absolutely owing,' albeit as yet unmatured, the bank's right of setoff must be regarded as manifestly present.")).

ICX asserts that the debt on the USE Notes arose when they were issued (in 2002) even though payment of the principal was not due until 2007. Therefore, ICX argues that it may set off the USE Notes against the rejection damages claim it has.

■ The Court agrees with ICX. Under the Bankruptcy Code, a "debt" is de-

fined as "a liability on a claim." 11 U.S.C. § 101(12). A "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured...." 11 U.S.C. § 101(5)(A). Thus, a claim arises when the right to payment accrues, not when payment is due. *See, e.g., Gerth,* 991 F.2d at 1434 (holding that debt arose when contract was signed even though payment was contingent on funds first being appropriated by Congress); *Young,* 144 B.R. at 47 (concluding that claim for disaster benefits did not arise until Congress passed legislation declaring crops eligible even though Congress had passed prior act expressing general intent to provide such benefits in future); *Nickerson,* 62 B.R. at 87 (holding that insurance broker could set off unearned premiums paid pre-petition against debt owed it even though amount of its debt could not be calculated until audit was performed post-petition); *Isis Foods,* 24 B.R. at 77 (finding that bank could set off debtor's funds deposited pre-petition against debt represented by installment note even though no payments were due under the note as of the petition date).

The *Frenville* case cited by the Trust is clearly distinguishable from the instant case. In *Frenville,* the Third Circuit was considering the effect of the automatic stay on a common law right of indemnity or contribution. 744 F.2d at 334. The Third Circuit determined that under New York law such a claim "does not accrue at the time of the commission of the underlying act, but rather at the time of the payment of the judgment flowing from the act." *Id.* at 337. The Third Circuit did take pains to distinguish *Frenville* from circumstances similar to the instant case, noting that "[t]he present case is different from one involving an indemnity or surety *contract.* When parties agree in advance that one party will indemnify the other party in the event of a certain occurrence, *there exists a right to payment, albeit contingent, upon the signing of the agreement." Id.* at 336 (emphasis added).

Therefore, the Court concludes that *Frenville* actually supports ICX's argument that the USE Notes claim against it is a pre-petition claim. In this case, ICX became obligated on the USE Notes when it executed them in May 2002, even though payment was due sometime in the future. Therefore, the Court concludes that the debt represented by the USE Notes was a pre-petition debt. Because the rejection damages are pre-petition debt pursuant to section 365(g), both obligations are pre-petition debts subject to setoff under section 553.

### 4. *Both Claims Must Be Between the Same Parties*

The Trust argues that setoff is not available in this case because the two obligations are not between the same parties. *See, e.g., In re Winstar Commc'ns,* 315 B.R. 660, 662–63 (D.Del.2004) (holding that setoff requires that the two obligations be mutual, that is, between the same parties standing in the same capacity).

ICX argues that the obligations are mutual because USE Delaware is a party to both documents, the USE Notes and the Distribution Agreement. In this case the USE Notes are due by ICX to USE Delaware. The Distribution Agreement, on which the rejection damages claim is premised, is between ICX and TVC and USE Delaware.

The Trust contends, however, that USE Delaware was merely a nominal party to the Distribution Agreement and that any rejection damages are owed by TVC. ICX disagrees, arguing that USE Delaware was acting in its own name in executing

the Distribution Agreement, not as an agent for any other party. *Cf. Winstar*, 315 B.R. at 663 (holding that setoff denial was appropriate where creditor—acting as agent for state—owed tax refund to debtor, while it held claim against debtor in its own right). Therefore, ICX asserts that its rejection damages are due from USE Delaware as well as from TVC.

The Court finds that this is a material issue in dispute precluding the grant of summary judgment. It is unclear in what capacity USE Delaware executed the Distribution Agreement. To the extent that ICX's rejection damages are based only on obligations that TVC had under the Distribution Agreement, then only TVC may owe it. To the extent those damages are based on obligations that USE Delaware has, however, they may be set off against the obligation owed by ICX to USE Delaware represented by the USE Notes.

### D. *Recoupment*

The Trust asserts that ICX is not entitled to recoup its rejection damages under the Distribution Agreement from the amounts it owes under the USE Notes (which arose under the APA), because the two claims do not arise from the same transaction. *See, e.g., Schweiker*, 739 F.2d at 875 (stating that recoupment is appropriate where "the creditor's claim against the debtor arises from the same transaction as the debtor's claim ... [and] is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation."). The Trust argues that the APA and the Distribution Agreement were two distinct transactions: one for the purchase of the business and the other for the marketing and sale of product. Therefore, it contends that recoupment is not available in this case. *See, e.g., University Medical Center*, 973 F.2d at 1081 (concluding that recoupment was not available for

obligations arising under agreements between the same parties covering two different years). Further, the Trust asserts that recoupment is an equitable doctrine and is only available where "it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *Id.* at 1081.

ICX argues that the APA and the Distribution Agreement were one integrated transaction. ICX contends that if it had not gotten the agreement with TVC to distribute its product to TVC's established customer base and to set off purchases by TVC against the USE Notes, ICX would not have agreed to pay the $25 million purchase price for the business. ICX asserts that its position is supported by the documents. The APA contains a definition of both the USE Notes and the Distribution Agreement and attaches a draft of both. (App. A0314–15, A0317) Further, ICX notes that the APA's integration clause states that "[t]his Agreement (including the documents referred to herein) constitutes the entire agreement between the Parties...." (App. A0334–35) Finally, ICX notes that both the Distribution Agreement and the USE Notes state that the USE Notes can be satisfied by the discount granted to TVC on each unit sold by it under the Distribution Agreement. (App. A0303, A0342) ICX therefore contends that the APA, the USE Notes, and the Distribution Agreement were part of a single integrated transaction and recoupment should apply. *See, e.g., In re Anes*, 195 F.3d 177, 182 (3d Cir.1999).

The Trust disputes this, asserting that the transactions were clearly distinct. It argues that the integration clause is merely intended to preclude the use of parol evidence in interpreting the APA. It contends that it is obvious from the two agreements themselves that they were distinct and not one. The APA involved the

sale of a business and the Distribution Agreement was a marketing agreement. The sale closed on May 8, 2002, while the Distribution Agreement was not executed until May 20, 2002. The sale provided for a $25 million purchase price subject only to adjustment under section 7(b) of the APA. The Trust maintains that the two agreements were distinct and not one integrated transaction.

▮▮▮▮▮ Recoupment is available only where the two obligations arise from the same transaction. The Third Circuit has explained that

> [f]or the purposes of recoupment, a mere logical relationship is not enough: the "fact that the same two parties are involved, and that a similar subject matter gave rise to both claims, . . . does not mean that the two arose from the 'same transaction.' " Rather, both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations.

*University Medical Center*, 973 F.2d at 1081 (*quoting Schweiker*, 739 F.2d at 875). *See also, HQ Global*, 290 B.R. at 80–81 (recoupment typically involves a single contract). However, the Court concludes that whether the APA and the Distribution Agreement were part of one integrated transaction so as to permit recoupment is a disputed material fact which precludes the grant of summary judgment to the Trust on this point. *See, e.g., Estate of Schuler v. Comm'r of Internal Revenue*, 282 F.3d 575, 578 (8th Cir.2002) (concluding that whether several transactions are integrated steps to a single transaction is a factual question).

E. *Is ICX's Claim Subordinate to the Lenders' Liens?*

The Trust argues that even if ICX has a right of setoff, it is subordinate to the claims of the Senior Lenders and Subordinated Noteholders. *See* Colo.Rev.Stat. Ann. § 4–9–404(a)(2) (West 2007) (providing that a creditor's setoff right is subordinate to a prior perfected security interest where the creditor received notice of that security interest). *See also, In re Commc'n Dynamics, Inc.*, 300 B.R. 220, 223 (Bankr.D.Del.2003) (holding that setoff right was subordinate to secured creditor's lien where creditor claiming setoff had received notice of the secured creditor's lien); *In re Primary Health Systems, Inc.*, 258 B.R. 111, 117 (Bankr.D.Del.2001) (holding that reclamation rights were subordinate to secured creditor's liens).

The Trust contends that ICX had notice of the security interests of the Senior Lenders and Subordinated Noteholders because they had filed financing statements in accordance with the Uniform Commercial Code (the "UCC"). *See, e.g., Moffat County State Bank v. Producers Livestock Mktg. Ass'n*, 598 F.Supp. 1562, 1567 (D.Colo.1984) (holding that the filing of a UCC financing statement in livestock was sufficient notice to creditors of security interest in proceeds thereof). Further, the Trust notes that ICX had actual notice of the security interest because the APA required the consent of the secured parties. (App. A0326–28) Because the claims of the secured parties far exceed the value of the Debtors' assets, the Trust contends that ICX's claim must be treated as unsecured.

▮▮▮ ICX disagrees. Preliminarily, ICX argues that the Trust does not have standing to assert the rights of the secured parties. *See, e.g., People ex rel. Simpson v. Highland Irrigation Co.*, 893 P.2d 122, 127 (Colo.1995) (noting that the requirement that a plaintiff have standing to sue prevents "plaintiffs from asserting claims in which they have no stake, and ensures

that the jurisdiction of the courts is exercised only when an actual case or controversy exists.").

The Trust responds that it is not seeking to assert the secured creditor's claims for purpose of recovering on them; rather, it is raising those claims as a defense to the setoff claim asserted by ICX. The Trust contends that the concept of standing only prevents a party from asserting a claim for recovery but does not prevent a party from raising or challenging another party's affirmative claims or defenses. *See, e.g., Mortgage Inv. Corp. v. Battle Mountain Corp.,* 70 P.3d 1176, 1182 (Colo. 2003) (holding that "[t]raditional concerns surrounding standing are not implicated when a defendant's standing is challenged; a defendant may assert an affirmative defense in response to a complaint, which asserts that the defendant has an interest in the action."); *Simpson,* 893 P.2d at 127 (same). Further, the Trust notes that it has the authority and the obligation under the Plan to object to claims, which is what it is doing with respect to ICX's claim.

The Court agrees with the Trust that it has standing to raise the secured parties' status in response to the assertion of a right of setoff by ICX. In this case, it is not the Trust in the first instance asserting a claim (for which it must have standing); rather the Trust is merely defending against the claim asserted by ICX, which clearly has standing to assert that claim. As explained by the *Simpson* Court, the traditional concerns about a court's jurisdiction that underpin the standing concept are not implicated with respect to the defendants, because once the plaintiff has established standing and the defendants have been haled into court by the plaintiff, the only role for the defendants is to defend against the suit. The defendants' affirmative defense does not constitute an independent cause of action,

but is a defensive claim only. Therefore, the rules for determining whether a plaintiff has standing are simply inapplicable. . . .

893 P.2d at 127.

ICX also argues that "a secured party's security interest is subject to setoff defense or claim in recoupment arising from *the transaction* that gave rise to the relevant contract." 5 *Collier on Bankruptcy* ¶ 553.12[1] (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev.2007) (emphasis added). It also argues that "a secured party's security interest in collateral is also subject to any setoff defense or claim in recoupment arising from *other transactions,* provided that the defense or claim accrued prior to [ICX's] receipt of notification of the assignment of the collateral to the secured party." *Id.* (emphasis added).

The Court notes that despite the use of the word setoff, *Collier* is properly noting the distinction between recoupment (which is not subordinate to the claims of a secured party) and setoff (which is subordinate to the claims of a secured party once notice is received). Under the express language of the UCC, ICX's recoupment rights, if any, are not subordinate to the Senior Lenders' or the Subordinated Noteholders' liens. *See* Colo.Rev.Stat. Ann. § 4–9–404(a)(1) ("the rights of an assignee [the Senior Lenders and Subordinated Noteholders] are subject to: (1) All terms of the agreement between the account debtor [ICX] and assignor [Debtors] and any defense or claim in recoupment arising from the transaction that gave rise to the contract."). Because there is a material issue in dispute as to whether ICX has any recoupment rights, the Court cannot grant summary judgment on this point.

With respect to ICX's setoff rights, if any, the UCC states that they are subject

to the rights of the Senior Lenders and Subordinated Noteholders if financing statements were filed or ICX otherwise had notice of their liens before its setoff rights accrued. *See* Colo.Rev.Stat. Ann. § 4–9–404(a)(2) ("the rights of an assignee [the Senior Lenders and Subordinated Noteholders] are subject to: ... (2) Any other defense or claim of the account debtor [ICX] against 'the assignor [Debtors] which accrues before the account debtor [ICX] receives a notification of the assignment authenticated by the assignor [Debtors] or the assignee [the Senior Lenders and Subordinated Noteholders].").

ICX contends, however, that the rights of the Senior Lenders and Subordinated Noteholders to the collateral at issue (the USE Notes) have been waived under the terms of the Global Settlement Agreement. Specifically, it notes that in paragraph 3(a)(2) the Senior Lenders expressly released any lien they may have had against the USE Notes and in paragraph 6(a) the Subordinated Noteholders granted a release. (App. A0502, A0505)

The Trust responds that the release granted by the Subordinated Noteholders was only of the Senior· Lenders and, therefore, not of the interest they had in the USE Notes.

The Court concludes that to the extent that the Senior Lenders released any security interest in the USE Notes, that security interest is no longer an impediment to ICX's assertion of a setoff right against those Notes. Further, the position of the Trust that the Subordinated Noteholders still hold an interest in the USE Notes appears to be in conflict with its assertion that the USE Notes were transferred to the Trust under the Plan for the benefit of the unsecured creditors.[6] Because this is

a material issue in dispute, the Court is unable to grant summary judgment on this point.

### F. Is ICX's Claim Precluded by Waiver, Estoppel, or Accord and Satisfaction?

#### 1. Waiver

The Trust also argues that any claim ICX may have of setoff or recoupment is precluded by the equitable doctrines of waiver and/or estoppel. It asserts that ICX waived any setoff or recoupment rights when it insisted that the Debtors reject the Distribution Agreement and "replace" it with the NEMRA.

ICX argues that waiver requires a showing of intent to relinquish or abandon a claim. *See, e.g., Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *People v. Bottenfield,* 159 P.3d 643, 644 (Colo.Ct.App.2006). Consequently, ICX argues, it is inappropriate to grant summary judgment in favor of the Trust on this issue. ICX argues further, however, that the parties' agreement itself demonstrates that there was no intent by ICX to waive any of its rights. Specifically, ICX notes that the NEMRA expressly preserved all of ICX's rights under the Distribution Agreement.

 The Court concludes that ICX is correct: there was no waiver. A waiver is the "intentional relinquishment or abandonment of a known right or privilege." *Johnson,* 304 U.S. at 464, 58 S.Ct. 1019. *See also Bottenfield,* 159 P.3d at 644. Waiver may be implied from conduct but "[t]he conduct must be free from ambiguity and clearly manifest the intention not to assert the benefit." *Cooper v. First Inter-*

---

6. The Trust acknowledges that "there may be some ambiguity regarding the USE Note pledged to the Subordinated Noteholders. Specifically, there may be an issue whether that particular note remains subject to their liens." (Trust's Br. 27 n. 15.)

*state Bank of Denver, N.A.,* 756 P.2d 1017, 1019 (Colo.Ct.App.1988).

▋ In this case, the NEMRA unambiguously preserves any claims that ICX might have under the Distribution Agreement. (App. A0372) This evidences no intent to waive such rights. Therefore, the Court concludes that ICX did not waive any right to assert rejection damages under the Distribution Agreement or the right to set off or recoup those damages against its obligations under the USE Notes.

2. *Equitable Estoppel*

The Trust also asserts that the doctrine of equitable estoppel (or implied waiver) precludes ICX from now asserting that it is entitled to set off or recoup its rejection damages claim against the USE Notes. The Trust notes the conduct of ICX in insisting that the Debtors reject the Distribution Agreement and replace it with the NEMRA. In the motion for approval of the rejection of the Distribution Agreement and approval of the NEMRA, the Debtors stated that it was more cost-effective than assuming the Distribution Agreement and paying the cure of $1.3 million. (App. A0375–81) The Trust contends that because ICX did not object to that motion, the Debtors were led to believe that ICX agreed with those statements.

ICX disputes these facts and argues that it is inappropriate to grant summary judgment on this point as a result. It also argues that equitable estoppel requires a showing of intent, which the Trust has not established. *See, e.g., Abromeit v. Denver Career Serv. Bd.,* 140 P.3d 44, 52–53 (Colo. Ct.App.2005) (holding that equitable estoppel applies when "the party to be estopped [knows] the facts and either intend[s] the conduct to be acted on or so act[s] that the party asserting estoppel must be ignorant of the true facts, and the party asserting

estoppel must rely on the other party's conduct with resultant injury.").

The Trust responds that the crux of estoppel is reliance, not intent. *See, e.g., Lyng v. Payne,* 476 U.S. 926, 935, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986) ("An essential element of any estoppel is detrimental reliance on the adverse party's misrepresentations.").

▋ To establish equitable estoppel, a party must show that "(1) he lacked the knowledge of the true facts or he lacked the means to obtain the truth; (2) he relied on the conduct of the party against whom the estoppel is claimed; and (3) he suffered a prejudicial change of position as a result of his reliance." *Benitec Australia, Ltd. v. Promega Corp.,* No. Civ. A. 04–889, 2005 WL 549552, at *5 (D.Del. Mar. 8, 2005). *See also, Paramount Aviation Corp. v. Agusta,* 178 F.3d 132, 148 (3d Cir.1999) (holding that to establish equitable estoppel or implied waiver a party must show it was misled and prejudiced by another's conduct).

▋ The Court concludes that the Trust has failed to establish that equitable estoppel applies in this case. First, the Court does not find that the Debtors lacked knowledge of the true facts or lacked the means to obtain the truth. The Debtors were aware of the terms of the parties' agreements and were represented by counsel. They therefore had the ability to determine for themselves the full impact on the estate of rejection of the Distribution Agreement. Second, as noted above, the Court finds that ICX had no duty to advise the Debtors of the effect of the rejection of the Distribution Agreement. Therefore, it would not be reasonable for the Debtors to rely on the failure of ICX to respond to the Motion to reject the Distribution Agreement as a confirmation of what the Debtors recited therein. Fi-

nally, the Court is not convinced that the Debtors would have changed their position (and not have rejected the Distribution Agreement) if ICX had informed them of its right to assert setoff or recoupment. Because of the cost of performing the Distribution Agreement (which TVC had been unable to do pre-petition) and the possibility of an administrative expense if the Debtors had been unable to perform after assuming it, the Court cannot conclude that the Debtors relied on any representation of ICX in deciding to reject the Distribution Agreement. Therefore, the Court cannot find that the Debtors were prejudiced by the alleged conduct of ICX. Consequently, the Court concludes that equitable estoppel does not apply.

### 3. *Accord and Satisfaction*

■ The Trust also asserts that the facts support a finding that the parties entered into an accord and satisfaction. It contends that an accord and satisfaction requires "(1) a bona fide dispute among the parties as to the amount of the debt must honestly exist, (2) the debtor tendered an amount to the creditor in honest belief that such would constitute satisfaction of the debt, and (3) the creditor accepts such payment." *Benitec Australia,* 2005 WL 549552, at *5. The Trust's contention is, in essence, that the execution of the NEMRA was to satisfy the Debtors' obligations under the Distribution Agreement and that ICX's acceptance of the NEMRA created an accord and satisfaction.

The Court does not agree. The NEMRA itself states that all of ICX's rights under the Distribution Agreement are preserved. (App. A0372) Therefore, the execution of the NEMRA cannot be a satisfaction of ICX's rights under the Distribution Agreement. The doctrine of accord and satisfaction simply does not apply here.

### IV. *CONCLUSION*

For the reasons stated above, the Court will deny the Motion for Summary Judgment filed by the Trust.

An appropriate Order is attached.

### *ORDER*

AND NOW this **21st** day of **FEBRUARY, 2008,** upon consideration of the Motion for Summary Judgment filed by the CDI Trust and the briefs of the parties relating thereto, it is hereby

**ORDERED** that the Motion is **DENIED.**